

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-08-00014-CV

_____

## IN THE MATTER OF A.D.

On Appeal from the 6th Judicial District Court
Lamar County, Texas
Trial Court No. 03-JV-07

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

OPINION

A.D., a fourteen-year-old boy, was driving the family sports utility vehicle (SUV) on a country farm-to-market road at approximately sixty to seventy miles per hour when he lost control and the SUV flipped repeatedly. A.D. had been drinking alcoholic beverages before the accident. Unfortunately, four of his friends were also in the vehicle. Two were thrown out of the vehicle. Isaac Knelson sustained serious injuries to a leg, and Martin Harder died at the scene. A.D. has no criminal record, and there was no evidence that he had any criminal history or prior interaction with the legal authorities. A petition alleging A.D. engaged in delinquent conduct was filed; he pled true to the offense of intoxication manslaughter.

A jury assessed a ten-year sentence with no recommendation of probation. The court entered a disposition order of commitment to the Texas Youth Commission (TYC) on a determinate sentence of ten years.[1] The points of error all relate to the disposition phase of the case.

One of the unusual facts in this case which affects various issues is that the juvenile is a follower of the Mennonite faith. He and his family live in a tight-knit Mennonite community in Lamar County called Tigertown. The group are Mexican citizens who moved to East Texas from Mexico only a few years earlier. A.D. argues on appeal that (1) he was denied due process of law and was discriminated against due to cultural and religious reasons; (2) his lawyer was ineffective;

---

[1]TEX. FAM. CODE ANN. § 54.04(d)(3) (Vernon 2008) (commitment to TYC with possible transfer to Texas Department of Criminal Justice).

2

and (3) the evidence was insufficient to prove the requirements for commitment to TYC. We sustain the sufficiency of evidence point and remand the case for a new disposition hearing.

## I.        Denial of Due Process

A.D. argues that a new punishment hearing is required because evidence was presented to the jury that was of such a nature as to violate his right to due process of law and equal protection of law under the United States and Texas Constitutions.[2] Specifically, he contends that the repeated references to the religious group of which A.D. is a part were such as to encourage the jury to make its determination of appropriate punishment based not upon the law, but instead upon its opinion of a member of a group that is a type protected by constitutional fiat. The evidence contains some information about the Mennonite community.

The basic language used by the Mennonites is low German—the language of their forebears. Because A.D.'s family lived in Mexico for many years, A.D.'s English language skills were not the best (although his Spanish language skills were evidently considerable). Because he, like all children of that religious group, ended his formal education early, he had received little or no formal schooling in Texas. The Mennonites provide their own schools for their children, focusing on

---

[2]The First Amendment to the United States Constitution provides in part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. 1. This provision applies to State action by virtue of the Fourteenth Amendment to the United States Constitution. *Cantwell v. Connecticut*, 310 U.S. 296 (1940) (incorporating free exercise clause); *Everson v. Bd. of Educ.*, 330 U.S. 1 (1947) (incorporating establishment clause).

pragmatic skills and based strongly on study of the Bible. They end such schooling for their children at between ages twelve and fourteen, and the children typically go to work shortly thereafter.

The State presented juvenile probation officer Debbie Kennedy as its main witness providing evidence other than testimony about the accident and its aftermath. Kennedy first testified that A.D. needed rehabilitation for alcohol abuse, and decried the "parental lack of supervision. There's some definite issues there. And also some terrible errors in judgment." She testified that it showed very poor adult judgment to allow a fourteen year old to drive and that, "I also feel it's poor adult supervision to allow your child not to be in school."

She stated repeatedly that she believed A.D. should be sent to TYC, stating,

I don't feel that he could be successful on probation while he's in his environment in his community and in his home for the level of supervision that I think he needs for rehabilitation.

Kennedy opined that A.D. was addicted to alcohol and needed the rehabilitation options available at TYC. She also emphasized the educational aspects of TYC, stating that she would also like for A.D. to get an education and that the correctional portions of TYC curriculum would help him to acknowledge what led to the offense and that he could be trained in "relapse prevention skills."

Kennedy also opined that TYC was appropriate because, "I think that the family is going to find it difficult to comply with the orders of the Court because that's not what's expected in their community." She acknowledged that they would agree to enforce the conditions of probation (which

4

could include attending school), but complained that she had limited ways of ensuring that they did, stating,

> I would basically have to go out to the home everyday to make sure that there's no alcohol in the house, has he been driving the vehicle. I mean, I have no way of knowing that this child isn't going to get in a vehicle at any time. How could I assure the public of that.

Ultimately, she recommended confinement of three years in TYC.

On cross-examination, Kennedy admitted that she could not ensure compliance with terms of probation in any case and that the offense was the unintentional crime of intoxication manslaughter, as opposed to the intentionally committed types of crimes of many of her clients. She found it quite unusual to have both parents present, much less both parents and a whole family to stand behind the child as in this case. Kennedy stated that the family had cooperated in every way with the probation department, providing translators, contacting individuals in the Tigertown community, and locating the parents of the deceased child. She criticized the Mennonite culture, which took their children out of school at the sixth-grade level, stating, "I think if you live in this area that you should send your children to school like everybody else does."

Kennedy stated that if A.D. was placed on probation, his supervision would include alcohol counseling, a six o'clock p.m. curfew, requiring him to go to school, performing community service, payment of probation fees, and compliance with whatever other counseling programs they deemed appropriate or necessary. She also testified that the doctor who did his psychological evaluation did not recommend TYC.

5

On re-cross examination, the State elicited testimony that Kennedy was concerned that the family would be unable to keep A.D. from drinking again, because

> I believe it's engrained in that community. Just as the testimony has been earlier today that these people are allowed to drive without a license at the age of 14, 15, 16, and that they do what the older boys do, and that it's readily available to them.

She testified that support of the community or "culture group" was important for a probationer to modify his behavior. She implied that the parents would not be helpful, but then relented to a degree:

> I'm not saying the parents wouldn't report any violations in this, but it's such a close community that it's hard, I think, for us to engage in that community and really find out what's going on in the home. And I definitely couldn't rely on the school to call me and say we're having trouble with this kid, because I don't know that they would put him in school.

In her final summary, she testified,

> Like I said, I just feel that the barriers are there. One, there's the language barrier. I can't communicate openly with the family unless somebody else is there to translate. And it's a closed community. You're not in there. I'm not in there. I don't know what it's like. I don't know what it's like in their home. I don't know. You know, if they're telling me one thing, are they going to follow through. It's hard for me because I'm not there. I can't see everything that goes on.
>
> Q.    Are you saying that centuries and generations of learned behavior are difficult to change?
>
> A.    I believe so.

Kennedy took the position that the type of offense warranted a TYC commitment, and she recommended a three-year term of confinement.

The jury charge does not direct the jury to involve or consider the religious beliefs or practices of the child or his community in assessing the sentence. However, the State argued this family lived in a society of "Mexican citizens" that did not send their children to school after about age twelve, and they would not "buck that system."

A.D.'s argument is phrased as a complaint that harmful evidence was improperly admitted during the punishment hearing. He argues that the evidence admitted about the nature of the religious community in which he and his family reside caused a violation of his right to equal protection of law. He argues that by introducing such evidence (and by closing arguments focusing on that evidence) the government attempted to treat him not as an individual, but as a component of a particular class—that of a religious group which has tenets that the State found particularly distasteful. Thus, he argues, the punishment assessed was not based solely on the individual, but at least in part upon the beliefs and practices of the religious community of which he is a part.

This argument is an attempt to show that this type of evidence is so completely improper that the admission of the evidence is error per se, as counsel chose not to object to its introduction at trial. Thus, the argument is not a complaint about violations of the Texas Rules of Evidence, it is something seeking to apply a far more fundamental analysis based on constitutional violations.

That said, counsel has not attempted to invoke the fundamental error concept embedded in Rule 103(d) of the Texas Rules of Evidence. TEX. R. EVID. 103(d). The rule allows a reviewing court to reverse fundamental error that was not objected to. However, this exception to the rule

7

requiring preservation of error is rarely applied. *See Miller v. State*, 939 S.W.2d 681, 688 (Tex. App.—El Paso 1996, no pet.) (stating application of exception is "frugal"). When the error is improper admission of evidence, it is fundamental only if the admission operates to render the defendant's trial fundamentally unfair. *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990).

That concept is nonetheless the main avenue of attack on the sentencing proceeding in this case. Even the introduction of evidence that violates the defendant's rights under the Equal Protection Clause is neither an absolute, systemic requirement, nor a right that is waivable only. *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002). All but the most fundamental rights may be forfeited if not insisted upon by the party to whom they belong. *Id.* at 887. An exception applies to two "relatively small" categories of errors: (1) violations of waivable–only rights; and (2) denials of absolute, systemic requirements. *See Aldrich v. State*, 104 S.W.3d 890, 895 (Tex. Crim. App. 2003). Examples of rights that are waivable only include the right to the assistance of counsel, the right to trial by jury, and a right of appointed counsel to have ten days of trial preparation that a statute specifically made waivable only. *Id.*

In *Saldano*, the court held that the failure to object to evidence that violated the defendant's rights under the Equal Protection Clause did not preserve an appellate issue because this was neither a waivable only right, nor an absolute systemic requirement even though the evidence concerned the

defendant's constitutional rights. *Saldano*, 70 S.W.3d at 889. Likewise, we find the failure to object to the evidence forfeited the right to raise these issues on appeal.[3]

## II.     Ineffective Assistance of Counsel

A.D. next contends that he received ineffective assistance of counsel at trial. A juvenile has a constitutional and statutory right to effective assistance of counsel in a juvenile adjudication proceeding. *See In re S.C.*, 229 S.W.3d 837, 842–43 (Tex. App.—Texarkana 2007, pet. denied); *In re R.D.B.*, 102 S.W.3d 798, 801 (Tex. App.—Fort Worth 2003, no pet.); *In re K.J.O.*, 27 S.W.3d 340, 342 (Tex. App.—Dallas 2000, pet. denied).

The effectiveness of counsel's representation in a juvenile proceeding is reviewed under the familiar, two-pronged standard set out by *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *S.C.*, 229 S.W.3d at 843. Appellant must show that his or her counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An allegation of ineffective assistance of counsel must be affirmatively demonstrated by the record. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). In this case, there was a hearing conducted by appellate counsel, questioning trial counsel in connection with A.D.'s motion for new trial. Accordingly, we have a record providing evidence about a number of the arguments made on appeal.

---

[3]We have recited the State's evidence in some detail even though we have found this point was waived, since the evidence is important in deciding other issues in the case.

A.D. contends that counsel was ineffective because he did not interview witnesses or call them on A.D.'s behalf and failed to object to inadmissible and harmful testimony or investigate the case.

## A.      Failure to Interview and Call Witnesses

### 1.      Family of the Deceased

Appellate counsel argues that trial counsel was ineffective because he did not interview any of appellant's potential witnesses besides A.D.'s immediate family.  In evaluating the first prong of the *Strickland* inquiry, we presume counsel's competence; an appellant must rebut this presumption by proving that the challenged action was not sound trial strategy.  *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (citing *Strickland*, 466 U.S. at 688–89 (defendant must overcome presumption that under the circumstances, the challenged action might be sound trial strategy)); *S.C.*, 229 S.W.3d at 845.

The argument is not that trial counsel failed to call witnesses—a question that is almost always a strategy decision, and thus virtually unchallengeable.  *See Ex parte Briggs*, 187 S.W.3d 458, 466–67 (Tex. Crim. App. 2005).  The argument is that counsel failed to interview potential witnesses—and thus obviously could not make a reasoned decision about whether to call them. Specifically, A.D. contends that counsel's failure to interview the parents of the decedent resulted in harm because it allowed the jury to speculate based on repeated argument by the State about the parents' desires.

10

To obtain relief on an ineffective assistance of counsel claim based on uncalled witnesses, the applicant must show that the witnesses were available to testify and that their testimony would have been of some benefit to the defense. *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004). Further, there are some cases holding that the failure to interview a witness is ineffective assistance when that inaction precludes the accused from advancing a viable defense. *State v. Thomas*, 768 S.W.2d 335 (Tex. App.—Houston [14th Dist.] 1989, no pet.).

It is apparent from the record of the hearing on new trial that the parents of the victim were available—they were located by A.D.'s parents, and the father, Peter Harder, testified that he would have come to trial if required to do so, although he was uncomfortable with appearing in a court. Harder testified that he believed A.D. should get probation because he believed A.D. would be able to learn something. He also testified that had he been ordered to appear, his testimony at the trial would have been the same.

Harder testified at the hearing that he had asked the coordinator if it was okay if he did not come. He stated that not testifying at the trial was not based on his religious beliefs, but instead it was the fact that he did not like to be there, and did not come into town often. Later, he stated that his religious beliefs did not allow him to sit in judgment of another.

At the trial, the State's victim coordinator, Allen Hubbard, explained that the State was not calling the deceased child's parents because they were "emotionally fragile" and because of cultural and language barriers as well as the portion of their faith that prohibits them from pronouncing or

11

exercising judgment on another person's actions, that if they were present, they would feel like they were participating in the trial.

Based on that testimony, the State emphasized how unusual it was for a victim's family member not to testify, and argued, "They're not here because they can't be here. They can't be here because of their emotional fragility. They can't face what's happened to their son. And on top of that, their faith tells them they can't come here to judge. . . . They didn't come here to tell you their story, but their story shouldn't be forgotten."

At the hearing on the motion for new trial, trial counsel responded that he knew Harder did not want A.D. to go to prison, which was the same belief of everyone in the Mennonite community. The trial attorney stated that he thought the fact that the parents of the deceased young man were not present "speaks volumes whether or not they want somebody to go to prison or not. And that was part of our strategy as well."

Based on the testimony of the trial attorney at the motion for new trial, even though he did not interview the parents of the deceased child, he knew from A.D.'s father that Harder did not think A.D. should be imprisoned, but did not want to testify. It is not uncommon in cases involving the death of a child for family members to attend the trial and demonstrate the deep concern they have as to the outcome of the case. Such witnesses are often, understandably, highly emotional and demonstrative of their grief. In this case, the State apparently thought it was necessary to present a witness to explain or defend why the parents of the deceased young man were not present. Counsel

12

might reasonably conclude that their mere presence in the courtroom during the trial involving the death of their child would be, on balance, detrimental. Under these circumstances, it is reasonable for counsel to believe that even though he knew they had stated that probation was appropriate, it would be more beneficial if the parents of the deceased young man were not present for the trial.

### 2.    Psychologist

A.D. also argues counsel was ineffective because he had not talked to the psychologist who had examined A.D. Trial counsel explained that he was able to present to the jury, through cross-examination of Kennedy, that the psychologist did not recommend that A.D. be confined. By that procedure, he would avoid any negative aspects of the psychologist's testimony, such as alcohol use in the community and the failure to attend school. When asked if he did not want the jury to have insight into the Mennonite community, trial counsel responded that he did not want the jury to hear of the many occasions where young men are driving intoxicated and that the sheriff's office had issued a memorandum stating that "something like this was going to happen." Under these circumstances, on the record presented, we cannot find counsel's performance to be deficient. The contention of error is overruled.

### B.    Failure to Object to Inadmissible Evidence and Investigate

A.D. complains that his trial attorney failed to object to the testimony of a state trooper who testified that .166 grams of alcohol per milliliters of blood is the same thing as 166 milligrams of alcohol per deciliter of blood.

13

A.D. elected to enter a plea of true and ask the jury to set the punishment. According to the trial attorney, part of the strategy was to accept responsibility for the crime. He further testified that while he had personally verified with the State's attorney the chain of custody of the blood samples, the defense elected to plead true and in such posture, did not think it was best to require all the laboratory and nursing witnesses that would have been necessary in a guilt/innocence trial. Once again, this is a reasonable strategic decision. We find no deficient performance on this issue by trial counsel. Overall, we conclude that the evidence does not establish deficient performance of trial counsel.

## III.    Sufficiency of the Evidence

A.D. next contends that the evidence is legally insufficient to establish that (1) A.D.'s parents could not provide the care and level of support and supervision needed to meet the conditions of probation or that (2) reasonable efforts had been made to prevent or eliminate the need to remove him from the home.

### A.    Statutory Requirements

Section 54.04(i) of the Texas Family Code requires the juvenile court to make the requisite determinations in its disposition order regardless of whether there was a jury at the disposition hearing. *See In re J.P.*, 136 S.W.3d 629, 630–31 (Tex. 2004) (holding under "plain language of the Family Code" that "if an initial disposition order places a child in [TYC] or on probation outside the home, it must expressly state that (1) removal from the home is in the child's best interests, (2)

14

reasonable efforts were made to avoid removal, and (3) care and supervision the child needs to meet the conditions of probation cannot be provided at home"); *In re T.A.W.*, 234 S.W.3d 704, 709–10 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *In re E.C.D.*, No. 04-05-00391-CV, 2007 WL 516137, at *11 & n.14 (Tex. App.—San Antonio Feb. 21, 2007, no pet.) (mem. op.) (holding in memorandum opinion that under Section 54.04(i), trial court was required to make the three determinations even though jury had sentenced child to TYC at disposition hearing).[4]  In reaching those determinations, the Texas Supreme Court has recently reminded courts that TYC is, as such a severe form of incarceration, reserved only for serious juvenile offenders. *In re J.P.*, 136 S.W.3d 629, 632 (Tex. 2004).

In support of his contentions, counsel directs us to several cases involving intentionally violent acts by juveniles.  In *In re A.S.*, 954 S.W.2d 855 (Tex. App.—El Paso 1997, no pet.), the court concluded that there was no evidence that the mother could not provide the quality of care and level of support and supervision that the juveniles needed to meet the conditions of probation—despite prior (but now ended) gang involvement, and found an abuse of discretion in sending A.S. to TYC.  In *In re K.L.C.*, 972 S.W.2d 203 (Tex. App.—Beaumont 1998, no pet.), a

---

[4]*In re J.G.*, 195 S.W.3d 161, 187 & n.5 (Tex. App.—San Antonio 2006, no pet.) (holding that even though jury sentenced juvenile to determinate sentence in TYC, only trial court could make the three determinations required to be in disposition order under Section 54.04(i)); *In re A.W.*, 147 S.W.3d 632, 636 & n.1 (Tex. App.—San Antonio 2004, no pet.) (same); *In re W.D.A.*, 835 S.W.2d 227, 230 (Tex. App.—Waco 1992, no writ) (reversing and remanding for new jury trial for juvenile's disposition hearing and stating that if jury found juvenile should be placed on probation outside the home or committed to TYC, then trial court would have to include the three mandatory determinations listed in Section 54.04(i) in its disposition order).

15

court reversed a disposition to TYC despite evidence that the juvenile attacked others with a box cutter—with an extreme school disruption background and evidence that K.L.C.'s parent could not provide adequate supervision. The court found no evidence to support a finding that "reasonable efforts were made" to eliminate the need to remove him from the home.[5]

Nevertheless, after a juvenile has been adjudged to have engaged in delinquent conduct, the juvenile court has broad discretion to determine a suitable disposition. *In re E.F.Z.R.*, 250 S.W.3d 173, 176 (Tex. App.—El Paso 2008, no pet.); *In re C.J.H.*, 79 S.W.3d 698, 702–03 (Tex. App.—Fort Worth 2002, no pet.). We will not reverse the juvenile court's findings regarding disposition absent a clear abuse of discretion. *E.F.Z.R.*, 250 S.W.3d at 176; *C.J.H.*, 79 S.W.3d at 702–03. In conducting this review, we engage in a two-pronged analysis: (1) did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion? *In re M.A.C.*, 999 S.W.2d 442, 446 (Tex. App.—El Paso 1999, no pet.).

**B.      Standard of Review**

The traditional sufficiency of the evidence issues become relevant factors in assessing whether the trial court abused its discretion. *In re A.E.E.*, 89 S.W.3d 250, 256 (Tex. App.—Texarkana 2002, no pet.). As to orders of disposition, we will use the civil standard of legal sufficiency in our consideration of the abuse of discretion standard. *In re T.E.G.*, 222 S.W.3d 677

---

[5]We also note the citation to *In re S.G.*, No. 04-04-00475-CV, 2005 WL 763277 (Tex. App.—San Antonio Apr. 6, 2005, no pet.), in which that court decried a sentence to TYC—largely because it cost too much to locally care for the girl—the "probation resources" were not available locally.

16

(Tex. App.—Eastland 2007 no pet.).[6] To determine whether a trial court abused its discretion, we must decide whether the court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *In re B.N.F.*, 120 S.W.3d 873, 877 (Tex. App.—Fort Worth 2003, no pet.). Merely because a trial court has decided a matter within its discretionary authority in a manner different from how an appellate court would have ruled in a similar circumstance does not demonstrate an abuse of discretion. *Sotelo v. Gonzales*, 170 S.W.3d 783, 788 (Tex. App.—El Paso 2005, no pet.). An abuse of discretion does not occur where the trial court bases its decision on conflicting evidence. *B.N.F.*, 120 S.W.3d at 877. Further, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision. *Sotelo*, 170 S.W.3d at 788.

### C. Evidence of Reasonable Efforts to Prevent Removal from Home

The evidence relevant to these issues, presented primarily from the juvenile probation officer, has previously been discussed at length. In summary, there is evidence that A.D. had been using alcohol (albeit without his parents' knowledge), that he had, with their knowledge, been driving

---

[6]The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* at 822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. Although we consider the evidence in a light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

without a license, and that they had removed him from public schooling in Texas at least in part by informing the authorities that he would be homeschooled—something they had no intention of doing.

When asked about the family, the probation officer stated that she did not think they provided enough supervision, they allowed A.D. to drive at age fourteen, did not require that A.D. attend public school, and the family would find it difficult to comply with the terms of probation because of what is expected in their community. She acknowledged that A.D.'s parents loved him and they had attended all sessions and meetings and that it is unusual for a child to have two parents actively involved in the proceedings. The psychologist who examined A.D. did not recommend confinement to TYC; alcohol treatment programs were available locally. Further, it is undisputed that A.D. had never before been referred to the juvenile authorities for alleged violations of the law and that his parents had been fully cooperative during the entire process. Since A.D. had never been involved in any juvenile offense, there had been no previous attempt to place him on probation at his home.[7] This case was handled in a most expeditious manner at the trial level.[8] After this offense occurred,

_____

[7]This offense occurred on December 2, 2007. The trial court entered a directive to apprehend A.D. on December 7, 2007. On December 11, 2007, the first of several detention orders was entered detaining A.D. in a juvenile detention facility. Other orders detaining A.D. were entered on December 27, 2007, and January 2, 2008. On January 7, 2008, A.D. entered a plea of true and was adjudicated. On that date, a jury was selected for the disposition trial. The verdict was returned the next day.

[8]Unfortunately, the expeditious manner of this trial was not carried forward on appeal. Texas law requires that when a juvenile has been taken from the custody of his or her parents, that case has precedence over all other cases. TEX. FAM. CODE ANN. § 56.01(h) (Vernon 2008). The court

18

there was no opportunity to determine if any form of alternative placement was feasible as A.D. was placed in confinement shortly after the offense occurred—where he has remained and is currently confined in TYC.[9]  When asked if the family's cooperation with juvenile probation officials was important in considering placement of the juvenile, the probation officer responded, "I just feel like the seriousness of this offense warrants a TYC commitment."

In its brief, although the State has a section on reasonable efforts to prevent or eliminate the need for the child's removal from home, it directs us to little to support this requirement.  The State

---

reporter's record was originally due May 9, 2008, but we granted the reporter an extension until June 9, 2008.  The record was not filed and on motion for extension, we ordered the court reporter on July 24 to file the record by September 15, 2008.  We amended that order, based on an allegation that the court reporter had surgery, and ordered the record filed by September 29, 2008.  The record was still not filed and on December 3, 2008, we ordered the court reporter to appear in our Court and show cause why she should not be held in contempt of court.  On December 8, 2008, the court reporter's record was filed with this Court.  Following that, the briefs were filed, the last being on March 30, 2009, causing this case to be submitted to us on April 22, 2009.  This twenty-one-page opinion was issued on May 15, 2009.

We acknowledge that some of this delay was due to our leniency in authorizing extensions. We do not intend to make that mistake again.  We call this requirement of expedited treatment in these cases to the attention of court reporters and trial courts to warn that this Court will take the necessary steps to ensure this type delay will not occur in the future.

[9]Many such cases involve juveniles who have previously been unsuccessfully placed on some form of probation or alternative placement. *See, e.g., In re J.L.H.*, No. 10-08-00126-CV, 2009 Tex. App. LEXIS 519 (Tex. App.—Waco Jan. 28, 2009, no pet. h.) (mem. op.) (previous offenses, ran away from placement); *In re J.A.S.*, No. 04-08-00173-CV, 2008 Tex. App. LEXIS 6908 (Tex. App.—San Antonio Sept. 10, 2008, no pet.) (mem. op.) (additional delinquent conduct, left home); *In re D.L.T.*, No. 03-06-0069-CV, 2008 Tex. App. LEXIS 5217 (Tex. App.—Austin July 9, 2008, no pet.) (mem. op.) (unsuccessful foster home placement, additional violations of law); *In re A.M.O.*, No. 07-07-0284-CV, 2008 Tex. App. LEXIS 571 (Tex. App.—Amarillo Jan. 25, 2008, no pet.) (mem. op.) (three-year juvenile delinquency history, new offenses while on probation).

points out that Kennedy testified that A.D. would remain at risk to himself absent treatment for alcohol abuse in a structured, monitored environment. The State mentions the family's failure to seek such treatment on its own and reiterates its points concerning the lack of supervision as shown by not being required to attend school and being allowed to drive without a license. Based on these factors, the State posits that it is clear the family cannot address A.D.'s treatment needs. The State concludes that the evidence is legally sufficient "that it was in Appellant's best interest to be placed in TYC." This is not the question on this portion of the finding; the question is whether there is any evidence of reasonable efforts made to prevent or eliminate removal of the juvenile from the home.

We have discussed the facts relative to A.D.'s home supervision. In considering whether reasonable efforts were made to eliminate the need to remove the juvenile from his home, the only other evidence to support the finding is the opinion of the juvenile probation department that such a placement would not work due to the family's culture. We do not believe this perception substitutes for factual evidence of some effort to avoid the need for the removal of the juvenile from the family home. We agree that a serious crime was committed resulting in the death of a young person. But we must apply the statutes as written, and we are not authorized to modify the requirements of the law.

There is no evidence to show that reasonable efforts were made to prevent or eliminate removing A.D. from his home. Indeed, there is no evidence any effort was made to avoid removing A.D. The trial court did not have sufficient evidence upon which to exercise its discretion to find

20

that reasonable efforts were made to prevent or eliminate removal of A.D. from his home. In making that finding, the trial court abused its discretion. We sustain point of error number five.

Having found error in the disposition order, it is reversed and this cause is remanded for a new disposition hearing. TEX. FAM. CODE ANN. § 56.01(i) (Vernon 2008).

Jack Carter
Justice

Date Submitted:     April 22, 2009
Date Decided:     May 15, 2009