

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-08-379-CV

IN THE MATTER OF C.C.B.

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

Appellant C.C.B. ("Calvin")[2] appeals the trial court's modified order of disposition committing him to the Texas Youth Commission ("TYC"). In two issues, Calvin argues that the trial court abused its discretion by failing to order further medical evaluations to determine the extent of the harm caused by his

---

[1] ... *See* Tex. R. App. P. 47.4.

[2] ... To protect the privacy of the child, we refer to him by pseudonym. Tex. R. App. P. 9.8(c).

concussions and that he received ineffective assistance of counsel by virtue of his attorney's failure to request further testing and investigate a possible "post-concussion syndrome" diagnosis. We affirm the disposition of the trial court.

## II.    Factual and procedural background

In his initial appearance in court, Calvin was adjudicated delinquent for unauthorized use of a motor vehicle, a state jail felony offense. Tex. Penal Code Ann. § 31.07 (Vernon 2003). The trial court placed Calvin on probation for one year, starting November 2, 2007. Calvin additionally had an aggravated assault offense, dating back to October 2007, reduced and probated as a misdemeanor on January 14, 2008.

On the night of July 18, 2008, officers caught Calvin and some of his friends attempting to break into a vehicle. Calvin managed to break free from the officer arresting him. Two days later on July 20, 2008, officers stopped Calvin and two other boys; Calvin told the officers his name was "Terry Willbanks." Calvin then fled from the officers and led a chase through yards and over fences. Officers used pepper spray to finally take Calvin into custody, and the chase resulted in an injury to an officer.

On August 8, 2008, the State filed a first amended motion to modify disposition, alleging that Calvin's conduct had violated his court-ordered probation. The motion stated that Calvin's actions violated several laws,

specifically his conduct in (1) fleeing Officer C.D. Riley during an arrest, (2) fleeing Officer J. Parham during an arrest, and (3) intentionally giving a false or fictitious name to a peace officer.[3] Tex. Penal Code Ann. §§ 38.02 (Vernon Supp. 2008), 38.04 (Vernon 2003). This conduct constituted Calvin's seventh referral to Juvenile Probation Services.

At the adjudication phase of his hearing, Calvin admitted to violating the terms of his probation and committing the offenses asserted by the State. Calvin stipulated to evidence supporting the allegations in the State's petition. At the disposition phase of his hearing, the State offered Calvin's social history, psychological evaluation, and resource staffing report without objection. The social history report gave various facts about Calvin's juvenile history, including his history with alcohol and his completion of the Family Partnership Program ("FPP") two weeks prior to the July 2008 offenses. The social history included a brief psychiatric evaluation section detailing Calvin's transfer to Millwood, a psychiatric facility, in April 2007 due to an incident where Calvin threw a knife at his sister and "[tore] up the house." The report stated that while being treated at Millwood, Calvin was diagnosed with "bipolar [disorder], disruptive

_____

[3] The motion also contained four paragraphs asserting that Calvin attempted to commit or committed two burglaries, but the State waived those cases.

behavior [disorder], and depression." The social history also stated that Calvin "refused to take his prescribed Lexapro, Respridol, and Cogentin" medications, and that his mother refused to return for further doctor's visits.

The social history stated that Calvin's mother was "overwhelmed by her parenting responsibilities" and had been "unsuccessful" in using what she had learned with the assigned counselor and juvenile probation officer. At the end of the social history, the report stated that Calvin had demonstrated that he was "a threat to his home and this community" and that TYC was a "much more secure environment" to serve Calvin's needs.

Dr. Sheree Gallagher, a clinical psychologist, authored the psychological report offered by the State. Calvin's probation officer had requested the evaluation to determine Calvin's treatment options. Dr. Gallagher's report gave an overview of Calvin's background and mental status based on his interview and psychological tests. Her report stated that his thought processes were "lucid, logical, and concrete" and that his short- and long-term memory was intact. Calvin's scores for verbal tasks were "average to below average," and his scores for non-verbal tasks were consistently average; both tests revealed impulsive behavior that hindered his social judgment. Dr. Gallagher expressed concern about Calvin's history of six concussions between 2005 and 2007, but

4

indicated she did not have medical records to understand the extent of his injuries.

Dr. Gallagher did not come to a definitive conclusion on the source of Calvin's "acting-out" behavior; rather, she stated in her summary that, if brain damage was found, the diagnosis could be a "Personality Change due to Multiple Head Injuries." Dr. Gallagher then stated that if "no neurological impairment is found, the diagnosis may more accurately be Conduct Disorder, Adolescent Onset Type."[4] Dr. Gallagher gave several recommendations, including "a comprehensive neurological evaluation" for his previous head traumas, a "neuropsychological evaluation" to determine if a possible impairment may have affected his ability to control his impulses and anger, and "residential treatment including intensive psychotherapy" for his issues of loss and abandonment.

During the hearing, Calvin's attorney asked him why he was not taking his prescribed medications, and Calvin testified that he did not like the way they made him feel "like a zombie." The trial court asked Calvin about his six

---

[4] "Conduct disorder" is defined as "a behavior disorder of childhood or adolescence characterized by a pattern of conduct in which either the basic rights of others or the societal norms or rules appropriate for a certain age are violated." American Heritage Stedman's Medical Dictionary (2002), *available at* http://dictionary.reference.com/browse/conduct%20disorder.

concussions, and he stated that he had several head injuries from "messing around, . . . playing tag, jumping over a tennis net . . . riding [his] bike and being hit and getting head injuries there." Calvin confirmed that the hospital treated him after each concussion and explained his injuries to him.

Calvin's attorney asked Calvin if he felt "sometimes as though there might be something wrong with [his] brain" or if he thought that he was not "thinking clearly" or understanding what was going on around him. Calvin testified, "No, I understand what is going on around me. Most of the time, I can't really concentrate on most things, though." Calvin then clarified this statement by stating that he "can't keep focused" and that this started to occur after the concussions.

Calvin's attorney addressed Calvin's history of head injuries in his closing argument, stating

> [i]f in fact the psychological report is accurate, it would seem important before the Court to make a decision about what to do to have the neurological testing done to see if some of these law violations may have something to do with his mental status which has disintegrated perhaps because of these concussions, so I would urge the Court to think about doing that.

The State asked for commitment to TYC in its closing argument, citing Calvin's previous opportunities for rehabilitation and his continued threat to the community. The trial court found that it was in the child's best interest to

revoke his probation and commit him to TYC until he reached the age of nineteen. Calvin appeals this disposition.

## III. Order of further neurological testing by trial court

In his first issue, Calvin argues that the trial court abused its discretion by committing him to TYC "without further testing" despite his "history of blunt trauma injuries to the head." Calvin argues that a residential in-patient program would have been a viable alternative, if a neurological examination had revealed "pathological damage to various areas of the brain."

### A. Standard of Review

A juvenile court has broad discretion to determine a suitable disposition for a child who has been adjudicated as having engaged in delinquent conduct. *In re H.G.*, 993 S.W.2d 211, 213 (Tex. App.—San Antonio 1999, no pet.). An abuse of discretion occurs when the juvenile court acts unreasonably or arbitrarily without reference to any guiding rules or principles. *In re K.J.N.*, 103 S.W.3d 465, 465–66 (Tex. App.—San Antonio 2003, no pet.). In appropriate cases, legal and factual sufficiency are relevant factors in assessing whether the trial court abused its discretion. *In re C.J.H.*, 79 S.W.3d 698, 702 (Tex. App.—Fort Worth 2002, no pet.). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would

in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.* at 702.

An abuse of discretion does not occur where the trial court bases its decision on conflicting evidence. *In re B.N.F.*, 120 S.W.3d 873, 877 (Tex. App.—Fort Worth 2003, no pet.). Further, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision. *In re C.J.H.*, 79 S.W.3d at 702. In conducting the review, we engage in a two-pronged analysis, (1) did the trial court have sufficient information upon which to exercise its discretion, and (2) did the trial court err in its application of discretion? *See In re A.D.*, 287 S.W.3d 356, 366 (Tex. App.—Texarkana 2009, pet. filed.); *In re M.A.C.*, 999 S.W.2d 442, 446 (Tex. App.—El Paso 1999, no pet.).

B.    Applicable Law

A trial court may modify a juvenile's disposition if the court, after a hearing to modify disposition, finds by a preponderance of the evidence that the child violated a reasonable and lawful order of the court. Tex. Fam. Code Ann. § 54.05(f) (Vernon 2008). The trial court has broad discretion to modify the disposition of a delinquency adjudication if the child has been adjudicated delinquent for committing a felony or misdemeanor on at least one previous occasion and the conduct which is the basis of the current adjudication

8

occurred after the date of the previous adjudication. Tex. Fam. Code Ann. § 54.05(f); *In re C.J.H.*, 79 S.W.3d at 702. The violation of any one condition of probation is sufficient for a trial court to enter an order modifying the juvenile's prior disposition. *See In re S.G.V.*, No. 04-05-00605-CV, 2006 WL 923576, at *3 (Tex. App.—San Antonio April 5, 2006, no pet.) (mem. op.).

The Texas Family Code permits a trial court to commit a child to TYC in a modification of a disposition if it makes the required findings that: (A) it is in the child's best interest to be placed outside the home; (B) reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the child's home; and (C) the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation. Tex. Fam. Code Ann. § 54.05(m)(1).

C. Analysis

Calvin does not dispute that he violated his probation order or that the trial court had the authority to modify his disposition. Because he asserts error in the trial court's discretion by committing him to TYC, we will briefly review the sufficiency of the evidence supporting the trial court's findings under section 54.04(m)(1).

Considering Calvin's best interests, the trial court heard ample evidence about Calvin's lack of structure and supervision at home, including his mother's testimony that Calvin ran away from home in October and December of 2007 and Calvin's testimony about non-compliance at school, throwing parties, and drinking two bottles of vodka over two days prior to his detention. The court also heard about his history of referrals for theft, assault, and running away and also his probation violations including failing to report in January and his three offenses in July. *See In re J.L.C.*, No. 02-06-00252-CV, 2007 WL 1168474, at *5 (Tex. App.—Fort Worth 2007, no pet.) (mem. op.) (stating that the best interests of children who engage in serious and repeated delinquent conduct are superseded to the extent they conflict with public safety).

Examining the reasonable efforts to prevent Calvin's removal from home, the trial court heard evidence of Calvin's newest violations occurring shortly after his completion of FPP and evidence of the failed attempts to enroll Calvin in Tarrant County Advocate Program ("TCAP"). The trial court also received evidence that Calvin's mother refused other services and did not pursue Calvin's prescription drug treatment with his doctor because she did not "want to waste their time."

The trial court heard ample evidence that Calvin could not have been provided the care, support, and supervision required for his probation while at

home. The psychological evaluation stated that the home structure is "chaotic," and Calvin described his home life by saying "there is always screaming and cleaning" and his siblings are "always making a mess." Calvin's mother is a single parent and gives Calvin adult responsibilities, such as being a care giver to his disabled brother and being a "father figure" to his other siblings. The social history stated that his mother was unsuccessful at using what she had learned from FPP counselors and Calvin's probation officer. Though Calvin's mother is unemployed and spends time at home, she testified that she often must leave Calvin unsupervised to attend doctor's visits for her youngest son's spina bifida condition. Calvin's mother stated that she was attempting to move the family away from Calvin's trouble-making friends, but was not currently able to secure housing. There was sufficient evidence for the trial court's decision to commit Calvin to TYC rather than to place him in an alternative treatment program. *See In re D.W.*, 02-08-00243-CV, 2009 WL 1815779, at *2 (Tex. App.—Fort Worth June 25, 2009, no pet. h.) (mem. op.) (holding that evidence of improper supervision and juvenile's need for structure supported trial court's action in committing D.W. to TYC rather than residential program for juvenile sex offenders).

Furthermore, with respect to Calvin's argument that the trial court should have ordered further testing, the trial court had the power to order a mental

11

examination on its own motion at any stage of the juvenile proceedings, but was not statutorily required to do so. *See In re J.K.N.*, 115 S.W.3d 166, 168–69 (Tex. App.—Fort Worth 2003, no pet.) (holding that trial court was not required to sua sponte order examination of juvenile's mental state); *In re E.M.R.*, 55 S.W.3d 712, 719 (Tex. App.—Corpus Christi 2001, no pet.) (same). The psychological evaluation in the State's exhibit suggested that Calvin would benefit from a comprehensive neurological evaluation; however, a possible diagnosis of neurological impairment would not necessarily have altered the trial court's findings that commitment to TYC was in Calvin's best interest, that reasonable efforts had been made to prevent removal from his home, and that he could not have been provided care and support in his home. *See* Tex. Fam. Code Ann. § 54.05(m)(1)(A)–(C). Further, the trial court's decision did not deny Calvin mental health services with his placement at TYC. *See In re J.D.P.*, 149 S.W.3d 790, 794–95 (Tex. App.—Fort Worth 2004, no pet.) (discussing extensive psychiatric services the juvenile received at TYC). The trial court had ample evidence of Calvin's missed opportunities for rehabilitation and his continued threat to his community to support its decision to commit Calvin to TYC, and the trial court did not abuse its discretion. *In re M.A.C.*, 999 S.W.2d at 446. Therefore, we overrule Calvin's first issue.

IV.     Ineffective Assistance of Counsel

In his second issue, Calvin argues that he received ineffective assistance of counsel because his attorney did not investigate Calvin's potential neurological condition or request further evaluation.

A.      Applicable law

A juvenile has a constitutional and statutory right to effective assistance of counsel in a juvenile adjudication proceeding.  *See In re S.C.*, 229 S.W.3d 837, 842–43 (Tex. App.—Texarkana 2007, pet. denied).   To establish ineffective assistance of counsel, an appellant must show by a preponderance of the evidence that his counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *In re S.C.*, 229 S.W.3d at 843.

Under the first *Strickland* prong, we look to the totality of the representation and the particular circumstances of each case.  *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).   The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error.  *See Strickland*, 466 U.S.

13

688–89, 104 S. Ct. at 2065. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *Salinas*, 163 S.W.3d at 740; *Mallet v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim. *Thompson*, 9 S.W.3d at 813–14. "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Salinas*, 163 S.W.3d at 740 (quoting *Mallett*, 65 S.W.3d at 63). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id*. (quoting *Thompson*, 9 S.W.3d at 813). It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial with a reliable result. *Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064. In other words, appellant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

14

different. *Id.* at 694, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding in which the result is being challenged. *Id.* at 697, 104 S. Ct. at 2070.

B.    Analysis

In this case, Calvin argues that his attorney failed to investigate Calvin's head injuries as potential mitigating evidence, despite having knowledge of Calvin's neurological concerns from Dr. Gallagher's psychological evaluation submitted two weeks prior to the hearing.[5] Calvin argues that his counsel should have followed through on Dr. Gallagher's recommendations for neurological testing and should have prepared for the questioning of his own client about his neurological status.

Calvin has presented no evidence rebutting the presumption that counsel's failure to investigate further was trial strategy. *See Jones v. State*, 170 S.W.3d 772, 775–76 (Tex. App.—Waco 2005, pet. ref'd) (holding that appellant must demonstrate that counsel's failure to request jury instruction was not trial strategy). Calvin's motion for a new trial did not directly address

---

[5] Citing *Wiggins v. Smith*, Calvin argues that counsel had a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. 539 U.S. 510, 521–22, 123 S. Ct. 2527, 2535 (2003).

15

his trial counsel's ineffectiveness; rather, the motion alleged legal and factual insufficiency and merely described the mother's assertion of a breakdown in the attorney-client relationship. *See Martin v. State,* No. 06-08-00190-CR, 2009 WL 2340665, at *4 (Tex. App.—Texarkana July 31, 2009, no pet. h.) (mem. op., not designated for publication) (holding that appellant failed to make an ineffective counsel complaint in her motion for new trial; thus, there was no record of a hearing conducted to explain the acts or omissions of trial counsel); *see also Chavarri v. State*, Nos. 02-08-00099-CR, 02-08-00100-CR, 2009 WL 885954, at *2 (Tex. App.—Fort Worth April 2, 2009, no pet. h.) (mem. op., not designated for publication) (stating that the appellant failed to develop the record by filing a motion for new trial to establish why his counsel did not hire a mitigation specialist and whether his counsel investigated the possibility of any mitigation evidence). Additionally, the record contains no statement or testimony from defense counsel regarding what he did. Without a record of why trial counsel failed to act, Calvin cannot carry his burden to overcome the presumption that failure to investigate further was trial strategy. *Jones*, 170 S.W.3d at 775–76; *see also Maldonado v. State*, No. 14-03-00074-CR, 2004 WL 234377, at *3 (Tex. App.—Houston [14th Dist.] Feb. 10, 2004, pet. ref'd) (mem. op., not designated for publication) (stating that a reviewing court cannot denounce counsel as ineffective absent some evidence of his strategy).

*Strickland* does not establish that an attorney must investigate "every conceivable line of mitigating evidence," but neither does it establish that a cursory investigation is sufficient where a reasonable attorney would make further inquiry. *See Wiggins*, 539 U.S. at 528, 533, 123 S. Ct. at 2538, 2541. The trial record only reveals that evidence that Calvin's potential brain damage was offered to the court through Dr. Gallagher's recommendations in the psychological evaluation and through questioning of Calvin himself about his concussions and understanding of the proceedings. The record does not affirmatively show his attorney's ineffectiveness in regards to this inquiry. Considering evidence of Calvin's known medical conditions, including bipolar disorder, disruptive behavior disorder, and depression, his attorney may have not pursued the neurological testing recommendation as a reasonable trial strategy because Calvin's impulsive "acting out" behavior could have been attributed to any or all of his diagnosed conditions. The record shows Calvin's attorney elicited testimony from Calvin about his concussions and discussed the potential brain damage in his closing argument; we cannot infer from the record that the attorney's treatment of this evidence was unreasonable. *See Mata*, 226 S.W.3d at 432. Considering all of the circumstances in this case and the undeveloped record, Calvin's attorney's decision to not pursue neurological testing fell within the range of reasonable and professional assistance. *See*

*Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) (overruling ineffectiveness claim and stating that it must not be built on retrospective speculation, but must be firmly founded in the record); *see also Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004) (concluding that it must presume counsel acted pursuant to reasonable trial strategy because it could only speculate as to why counsel acted or failed to act), *cert. denied*, 543 U.S. 1059 (2005).

Calvin's ineffectiveness claim fails under the first *Strickland* prong; thus, we do not address the second prong. Accordingly, we overrule Calvin's second issue.

V.    Conclusion

Having overruled both of Calvin's issues, we affirm the judgment of the trial court.

PER CURIAM

PANEL: GARDNER, MCCOY, and MEIER, JJ.

DELIVERED:  September 17, 2009