

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00070-CV

_____

IN THE MATTER OF W.B.G.

On Appeal from the 76th District Court
Titus County, Texas
Trial Court No. JV-763

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Burgess

# O P I N I O N

W.B.G., a juvenile, was placed on probation after he was adjudged to have engaged in delinquent conduct that would constitute theft of property and unauthorized use of a motor vehicle. The terms and conditions of his probation were modified and extended after he violated the trial court's original terms and conditions. After hearing evidence that W.B.G. violated the modified terms and conditions of his probation, the trial court revoked his probation and entered a disposition order committing him to the Texas Juvenile Justice Department (TJJD) for an indeterminate period, not to exceed his nineteenth birthday.

On appeal, W.B.G. challenges the trial court's finding that reasonable efforts were made to prevent or eliminate the need for his removal from his parents' homes. We find that the trial court did not abuse its discretion in making this finding. Accordingly, we affirm the trial court's judgment.

## I.      Factual Background

Prior to placing W.B.G. on probation, the trial court found that W.B.G. "and/or [his] family" were placed into the First Referral Program and received counseling with Next Step Community Solutions and Counselor Craig Pruitt. The family had also received services through the Texas Department of Family and Protective Services and Mental Health Mental Retardation (MHMR). To avoid a more serious disposition for W.B.G., the family entered into a deferred prosecution agreement, but W.B.G. refused to submit to either parent's authority. W.B.G. was also offered electronic monitoring, then detention for short periods of time, and then placement at the Azleway Substance Abuse Center, from which he absconded.

As a result, the trial court determined that reasonable efforts were made to prevent or eliminate W.B.G.'s removal from the home of each parent and to facilitate his return, but found it contrary to the child's welfare to return him to either home because his parents refused to abide by a deferred prosecution agreement and lacked sufficient parenting skills to provide adequate supervision. The trial court also found that W.B.G. refused to accept parental supervision, had a history of aggression towards others, and had suicidal ideations. Therefore, it determined that W.B.G.'s retention in a juvenile detention facility until he could be placed into the care and custody of the Center for Success and Independence at Rockdale Academy (Academy) was in his best interests. The trial court also ordered W.B.G. to complete twelve months of probation with the Titus County Juvenile Probation Department.

The terms and conditions of W.B.G.'s probation required him to abide by the Academy's rules and regulations and complete their "180 Good Day Conduct Offender program," among other things. After W.B.G. was unsuccessfully discharged from the Academy after 107 incident reports for not abiding by the Academy's rules and regulations, the State filed its first motion to modify W.B.G.'s disposition. W.B.G. stipulated to the evidence showing that he had violated the trial court's order. After the trial court found that W.B.G. had not demonstrated the ability to follow rules or control his anger or behavior, it placed him with the Grayson County Department of Juvenile Services (Department), ordered him to abide by its rules and regulation, and further ordered him to successfully complete its 180-day boot camp program. The trial court also ordered W.B.G.'s parents to participate in counseling and other family services offered by the Department.

3

W.B.G. did not comply with the trial court's orders. In its motion to revoke his probation, the State alleged that W.B.G. violated Department rules when he, among other things, (1) threatened to incite riots, (2) incited a riot among the other residents of the Department by using its emergency intercom system, (3) threatened to assault another resident, (4) yelled, used profanity, and made other threatening statements, and (5) was refused admittance into the boot camp program due to "continual disruptive behavior preventing staff from completing the intake process."

The trial court heard of the reasonable efforts made to prevent or eliminate the need for W.B.G.'s removal from his parents' homes at his disposition hearing. Sandra Dixon, the director of case management at the Academy, testified that W.B.G. joked about the Academy's rules, did not care when he violated them, and accumulated 107 incident reports for "noncompliance or just completely disobeying the rules." According to Dixon, twenty of those incidents were for serious violations including several assaults and acts of vandalism.[1] Dixon said W.B.G. cursed at and disrespected the staff and refused efforts from therapists and case managers to rehabilitate him towards progression in the program. Dixon believed that the Academy did all it could to help W.B.G. before he was discharged, opined that no other program in Texas would meet his needs, and concluded that only the highly structured environment of TJJD could benefit the child.

Haley Spindle, juvenile supervision officer at the Department, testified that W.B.G. used excessive profanity, made threats to riot immediately on arrival, used the Department's intercom

---

[1]Dixon testified that W.B.G. flooded his room twice, tore up his mattress, broke the light in his room, and kicked the door to his room.

4

system in an attempt to incite six other residents to commit assault and to riot, and had inappropriate conversations with female residents.

Casey Parker, a nurse with the Department, testified that she believed W.B.G. sabotaged his admission into the boot camp program by manipulating a tuberculosis skin test required for admission. Parker believed W.B.G. had scratched the area of the skin test to render the results inconclusive. He then refused alternate tuberculosis testing, which caused the Department to deny his entry into the boot camp program.

Susan Leblanc, W.B.G.'s juvenile probation officer, testified about the previously stated efforts, including first referral, made to prevent or eliminate the need for W.B.G.'s removal from the child's home and to facilitate his return to his parents. Leblanc noted that W.B.G. was previously offered deferred adjudication probation but was adjudicated after he stole a car while wearing an ankle monitoring device. Leblanc testified that Titus County had already spent $59,612.00 in its efforts to care for, supervise, and rehabilitate W.B.G. and that three other facilities she contacted after the Department rejected his placement refused to accept W.B.G. due to his "history of explosive violent behaviors." Leblanc said she felt that the system "used all the possible [services] in the community to assist [W.B.G.]" but was "unable to successfully work with him and rehabilitate him." Because she believed W.B.G. was a danger "possibly to himself or to others," Leblanc recommended W.B.G.'s placement with TJJD. She added that W.B.G. was currently at a detention center and that his behavior had improved.

W.B.G.'s mother testified about W.B.G.'s criminal behavior but said he was not violent. She agreed that W.B.G. had a history of violating the terms of his probation but attributed his

5

conduct to the probation department's failure to help and lack of supervision from his father, who was incarcerated for most of the child's life, and his grandmother. W.B.G.'s mother said she was able to control him while in her home and that he was always in his father or grandmother's care when he ran away or got in trouble. She claimed W.B.G.'s lack of improvement was related to not being "assessed properly or sent to the right places," administration of improper medication, and lack of proper medication at times. W.B.G.'s mother testified that the child's father and grandmother would pay her living expenses, even though she and the child's father failed to pay court-ordered fees, so that she could stay home with W.B.G. to provide him with a fresh start if he were returned to her.

After the hearing, the trial court found that (1) local resources of the court were inadequate to rehabilitate W.B.G., (2) W.B.G.'s mother refused to acknowledge the child's need for treatment, (3) W.B.G.'s father did not prohibit him from "roaming the streets and fraternizing with individuals" who encouraged the child's participation in illegal activity, (4) W.B.G.'s father was largely absent from the child's life because he had spent fifteen years in prison, and (5) both parents had little or no authority over the child. As a result, the trial court entered a disposition order committing him to the TJJD for an indeterminate period, not to exceed his nineteenth birthday.

## II.     Standard of Review

"A trial court's modification of juvenile disposition is governed by Section 54.05 of the Texas Family Code." *In re J.M.*, 287 S.W.3d 481, 486 (Tex. App.—Texarkana 2009, no pet.) (citing TEX. FAM. CODE ANN. § 54.05). With exceptions not applicable here, "[w]hen a juvenile has previously engaged in delinquent conduct, the trial court may modify the original sentence to

6

commit the juvenile to [TJJD] if the trial court determines, by a preponderance of the evidence, that the juvenile subsequently violated a reasonable and lawful order of the court." *Id.* (citing TEX. FAM. CODE ANN. § 54.05(f); *In re J.P.*, 136 S.W.3d 629, 632 (Tex. 2004); *In re T.R.S.*, 115 S.W.3d 318, 320–21 (Tex. App.—Texarkana 2003, no pet.)).

"Modifying a juvenile's probation is a decision which lies within the sound discretion of the trial court, reversible on appeal only on a finding that the trial court abused that discretion." *Id.* (citing TEX. FAM. CODE ANN. § 54.05; *J.P.*, 136 S.W.3d at 632; *In re J.R.C.*, 236 S.W.3d 870, 875 (Tex. App.—Texarkana 2007, no pet.); *In re M.A.*, 198 S.W.3d 388, 390–91 (Tex. App.—Texarkana 2006, no pet.)). "Merely because a trial court has decided a matter within its discretionary authority in a manner different from how an appellate court would have ruled in a similar circumstance does not demonstrate an abuse of discretion." *Matter of J.M.G.*, No. 06-16-00011-CV, 2016 WL 9175816, at *1 (Tex. App.—Texarkana Nov. 29, 2016, no pet.) (mem. op.) (quoting *In re A.D.*, 287 S.W.3d 356, 366 (Tex. App.—Texarkana 2009, pet. denied)). "Instead, '[a] trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to guiding rules or principles.'" *Id.* (quoting *In re J.M.*, 287 S.W.3d 481, 486 (Tex. App.—Texarkana 2009, no pet.)).

In reviewing the trial court's disposition for abuse of discretion "we engage in a two-pronged analysis: (1) did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion?" *Id.* at *1 n.1 (citing *A.D.*, 287 S.W.3d at 366). "Accordingly, '[t]he traditional sufficiency of the evidence issues become relevant factors in assessing whether the trial court abused its discretion.'" *Id.* (quoting *A.D.*, 287

S.W.3d at 366). "A trial court does not abuse its discretion if some evidence supports the decision." *Id*. at *1 (quoting *J.M.*, 287 S.W.3d at 486; citing *A.D.*, 287 S.W.3d at 366 (an abuse of discretion does not occur where the trial court bases its decision on conflicting evidence)).

Because the trial court committed W.B.G. to TJJD, it was required to and did determine that:

> (A)      it is in the child's best interests to be placed outside the child's home;
>
> (B)      reasonable efforts were made to prevent or eliminate the need for the child's removal from the child's home and to make it possible for the child to return home; and
>
> (C)      the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation.

TEX. FAM. CODE ANN. § 54.05(m)(1) (Supp.). W.B.G. agrees that the trial court properly found that he violated a lawful order. Yet, he challenges the trial court's finding that reasonable efforts were made to prevent or eliminate the need for his removal from his parents' homes.

## III.      Analysis

It is uncontested that there was ample evidence, particularly from Spindle and Parker, proving W.B.G.'s violation of the terms and conditions of his modified probation. "[A] single violation of the conditions of the juvenile's probation is sufficient to support a trial court's order modifying a juvenile's disposition." *J.M.*, 287 S.W.3d at 486 (citing TEX. FAM. CODE ANN. § 54.05(f); *In re J.A.D.*, 31 S.W.3d 668, 671 (Tex. App.—Waco 2000, no pet.); *In re S.G.V.*, No. 04-05-00605-CV, 2006 WL 923576, at *3 (Tex. App.—San Antonio Apr. 5, 2006, no pet.) (mem. op.)). Yet, "[t]he statutes do not require commitment to the [TJJD] for every probation

violation; but they suggest that such placement is for serious offenders." *J.R.C.*, 236 S.W.3d at 873 (citing *J.P.*, 136 S.W.3d at 632). "The [TJJD] is the most severe form of incarceration in the juvenile justice system, and it is neither reasonable nor appropriate in the area of juvenile law to use the final, most restrictive form of detention in all situations." *J.M.G.*, 2016 WL 9175816, at *2 (quoting *J.R.C.*, 236 S.W.3d at 873). "Trial courts have discretion in this context . . . to select the appropriate form of detention for juvenile offenders, and should exercise that discretion based on the facts of each case." *Id.* (quoting *J.R.C.*, 236 S.W.3d at 873).

W.B.G. argues that the trial court abused its discretion because the evidence was insufficient to show that reasonable efforts were made to prevent or eliminate the need for W.B.G.'s removal from his parents' homes. We disagree.

W.B.G. and the family were initially referred to the First Refusal Program, counseling with Next Step Community Solutions, and Pruitt. These programs and the services the family had already received through the Texas Department of Family and Protective Services and MHMR did not adequately assist W.B.G. In an effort to allow W.B.G. to remain at home, the family signed a deferred prosecution agreement, and W.B.G. was placed on an ankle monitor. The evidence showed that W.B.G. refused to submit to the authority of either parent and that the threat of prosecution had no deterrent effect. Instead, W.B.G. stole a car while wearing the ankle monitor. He ran away when he was placed with the Azleway Substance Abuse Center.

In addition to the programs and services offered to W.B.G. prior to placement on probation, the trial court noted that his placements with the Academy and Department were both unsuccessful and that W.B.G. continuously refused their rehabilitation programs. The trial court had required

9

W.B.G. to complete the Academy's 180 Good Day Conduct Offender program to prevent his placement into TJJD. W.B.G. did not complete the program and collected 107 incident reports for assault and vandalism, among other things. After the trial court found W.B.G. violated the trial court's probation terms and conditions, it gave W.B.G. another chance by sending him to the Department's boot camp program. Evidence from Spindle, Parker, and Leblanc showed that W.B.G. failed to comply with the terms and conditions of his modified probation. W.B.G. cursed, incited a riot, had inappropriate conversations with female residents, and prevented his admission into the program by manipulating a tuberculosis skin test and refusing alternate testing. W.B.G. concedes on appeal that "[c]ertainly past efforts to deal with W.B.G. appear to have been unsuccessful."

Titus County had already spent $59,612.00 in its unsuccessful efforts to rehabilitee W.B.G. "A trial court is not required to exhaust all possible alternatives before sending a juvenile to the [TJJD]." *Id.* at *4 (quoting *J.R.C.*, 236 S.W.3d at 875). Here, the trial court had ample evidence to rely on in deciding the proper disposition for W.B.G. It was aware of W.B.G.'s history of noncompliance with local treatment programs and other efforts to rehabilitate him and return him to his parents. "Failure to complete a local treatment program successfully supports a finding that TJJD may be more appropriate than placing a juvenile into another local treatment program." *Id.* (citing *J.R.C.*, 236 S.W.3d at 870). Nothing demonstrated that any alternative placement could provide treatment that had not already been provided to W.B.G. In light of Leblanc's testimony that she was unable to find a program that would accept W.B.G. and the long record of incident reports demonstrating W.B.G.'s disruption of the programs, neglect of therapy, power struggles

10

with staff, and failure to follow directives, the trial court could reasonably find that W.B.G. would have similar problems in another residential treatment facility or boot camp.

In light of the evidence presented at the disposition hearing, we cannot conclude that the trial court abused its discretion in determining that the proper disposition for W.B.G. was to be sent to the TJJD. *See id.*; *J.R.C.*, 236 S.W.3d at 874; *In re M.A.*, 198 S.W.3d 388, 391–92 (Tex. App.—Texarkana 2006, no pet.). Accordingly, we overrule W.B.G.'s point of error.

## IV. Conclusion

We affirm the trial court's disposition order.

Ralph K. Burgess
Justice

Date Submitted:     February 12, 2020
Date Decided:       February 13, 2020

11