

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-09-278-CV**

IN THE MATTER OF A.C.

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In four issues, Appellant A.C. appeals the trial court's decision to commit her to the Texas Youth Commission (TYC).  We affirm.

## II. Procedural History

The State charged that, on or about March 23, 2009, A.C. engaged in delinquent conduct by intentionally or knowingly threatening D.H. with imminent bodily injury and using or exhibiting a deadly weapon (scissors).  *See* Tex. Family Code Ann. § 51.03(a)(1) (Vernon Supp. 2009) (defining delinquent conduct); Tex.

---

[1] *See* Tex. R. App. P. 47.4.

Penal Code Ann. § 22.02(a)(2) (Vernon Supp. 2009) (defining aggravated assault).

Because A.C. was not yet sixteen years old at the time, she was tried as a juvenile.

*See* Tex. Fam. Code Ann. § 51.02(2)(A) (Vernon Supp. 2009) (defining "child" as a

person who is ten years of age or older and under seventeen years of age); *see also*

*id.* § 51.01 (Vernon 2008) (explaining purpose of juvenile justice code).

A.C. waived a jury trial and agreed to stipulate to the evidence, which included

the following:

- A.C. was fifteen years old and D.H. was fourteen years old—they were two middle school students in the same class;

- Their dispute began weeks before, but the March 23, 2009 argument involved a MySpace[2] post by A.C. in which she asserted that D.H. was afraid to meet her so they could fight;

- Other students in the classroom where the incident occurred heard A.C. threaten to stab D.H., tell D.H. that if D.H. hit her, A.C. would stab her, and tell D.H. that she was going to die;

- Their argument escalated to the point that the teacher had asked another student to get a campus monitor;

- A.C. grabbed a pair of scissors from a classroom work station and stabbed D.H. multiple times in the chest;

- A campus monitor and an assistant principal had to pull A.C. away from D.H.;

---

[2] MySpace is an interactive social-networking website. *See In re K.E.L.*, No. 09-08-00014-CV, 2008 WL 5671873, at *3 n.3 (Tex. App.—Beaumont Feb. 26, 2009, no pet.); *see also Draker v. Schreiber*, 271 S.W.3d 318, 326 (Tex. App.—San Antonio 2008, no pet.) (Stone, J., concurring) (observing, in a vice-principal's suit involving a false MySpace account set up by students, that "[t]he internet capabilities of modern society present numerous opportunities for individuals to engage in extreme and outrageous conduct that can produce severe emotional distress").

- D.H. suffered multiple stab wounds to her chest area, shoulder, and arms and had to be transported to Cook Children's Hospital for surgery; and

- The investigating police detective would testify that based on the case's facts and her experience as a police officer, the scissors were a deadly weapon and that, in the manner of their use or intended use on that day, they were capable of causing death or serious bodily injury.

The trial court found that A.C. had engaged in delinquent conduct as alleged. After hearing evidence at the disposition hearing, which we will discuss below in our factual sufficiency analysis, the trial court ordered A.C. committed to TYC for six years.

## III. Factual Sufficiency

All of A.C.'s challenges focus on the factual sufficiency of the evidence to support the findings upon which the trial court based its commitment decision after the disposition hearing.

## A. Standard of Review

A juvenile court has broad discretion to determine a suitable disposition for a child who has been adjudicated as having engaged in delinquent conduct. *In re C.C.B.*, No. 02-08-00379-CV, 2009 WL 2972912, at *3 (Tex. App.—Fort Worth Sept. 17, 2009, no pet.) (mem. op.). An abuse of discretion occurs when the juvenile court acts unreasonably or arbitrarily without reference to any guiding rules or principles. *Id*. In appropriate cases, factual sufficiency is a relevant factor in assessing whether the trial court abused its discretion. *See In re C.J.H.*, 79 S.W.3d 698, 702 (Tex. App.—Fort Worth 2002, no pet.). Merely because a trial court may decide a matter

3

within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id*.

An abuse of discretion does not occur when the trial court bases its decision on conflicting evidence. *C.C.B.*, 2009 WL 2972912, at *3. Further, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision. *C.J.H.*, 79 S.W.3d at 702. In conducting the review, we engage in a two-pronged analysis, (1) did the trial court have sufficient information upon which to exercise its discretion, and (2) did the trial court err in its application of discretion? *C.C.B.*, 2009 WL 2972912, at *3.

We apply the civil standard of review when reviewing the factual sufficiency of the findings at the disposition phase. *C.J.H.*, 79 S.W.3d at 703. That is, when reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Section 54.04(i) of the family code sets out the mandatory findings that the trial court must make to commit a child to TYC. *C.J.H.*, 79 S.W.3d at 704. It thus

4

informs the trial court's discretion.  *Id.*  Section 54.04(i) states that if the trial court commits the child to TYC, it shall include in its order its determination that:

> (A) it is in the child's best interests to be placed outside the child's home;
>
> (B) reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the child's home; and
>
> (C) the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation[.]

Tex. Fam. Code Ann. § 54.04(i)(1)(A)–(C) (Vernon Supp. 2009).  A.C. challenges all three findings in addition to the trial court's finding that it was in A.C.'s and society's best interests to commit her to TYC because she needed a highly structured environment with constant supervision and control.

## B. Disposition Hearing Evidence

The State rested after the trial court admitted Petitioner's Exhibit 1, a social history containing A.C.'s psychological evaluation by Dr. Raymond F. Finn, Ph.D.,[3] and Petitioner's Exhibit 2, an updated victim court report.  Mike Jennings, a Tarrant County Juvenile Probation officer who had been supervising A.C. for the three months before the disposition hearing, A.C.'s mother B.J., and A.C. testified at the hearing.

---

[3] "At the disposition hearing, the juvenile court . . . may consider written reports from probation officers, professional court employees, or professional consultants in addition to the testimony of witnesses."  Tex. Fam. Code Ann. § 54.04(b).

5

### 1. A.C.'s Pre-March 23 Incidents and Mental Health

A.C. had a prior referral involving an assault-family violence charge in 2008[4] from shoving or hitting her mother when B.J. tried to prevent her from leaving the house. Jennings testified that the police were called, but A.C. was not taken into custody because she had already left. He stated, "We offered the family to come in and do the medi[ation]. The mother declined mediation and stated that she did not wish to prosecute. She did not feel that it was something that she could not handle, and so she signed a declaration of non-prosecution." Jennings admitted that at the time of that incident, A.C. was able to leave the home against her mother's wishes. B.J. testified that her fight with A.C. occurred because A.C. wanted to leave and B.J. tried to stop her. She and A.C. fought in the hallway "for a little bit" and then she called the police because A.C. left. During that incident, A.C. scratched B.J. on her face. B.J. testified that this happened before they realized that A.C. was bipolar.

A.C. also has a history of fighting at school, and she has some learning disabilities, which Dr. Finn predicted would find A.C. continuing to experience school as frustrating, making her "prone to acting out." According to information contained in Dr. Finn's report, A.C. repeated the second grade because she was academically behind other students when she moved from California to Texas. A.C. repeated the seventh grade "due to frequent suspensions for such behavior as dress code

---

[4] It is unclear from the record whether this assault occurred in March, June, or August.

violations and fighting with other students." A.C. testified about potentially having to repeat the eighth grade as well.

A.C.'s first hospitalization for mental issues occurred in October 2008 after a physical argument with her step-father; she was hospitalized for eight days and diagnosed with major depressive disorder. She received a prescription for a sedative and for Zoloft, an antidepressant. In January 2009, while on these medications, A.C. tried to run away over a dispute with her mother about money sent to A.C. from her father. When B.J. brought her back home, A.C. kicked in the front door and threatened to kill both herself and her mother.

A.C. cut herself with an eyebrow cutter after B.J. called the police. B.J. had the police take A.C. to John Peter Smith hospital (JPS) when she learned that A.C. had taken "a whole bunch of different medications and tried to commit suicide that day."[5] B.J. testified that she had A.C. admitted to JPS, that they had to "shoot charcoal down her throat," and that A.C. was in the ICU for around a week. Later that month, A.C. was transferred to the University Behavioral Health Hospital of Denton (UBH), diagnosed with bipolar disorder, and prescribed Abilify, an antipsychotic drug, in addition to Zoloft; the sedative was discontinued.

---

[5] The medications belonged to B.J. During her psychological evaluation, A.C. acknowledged taking the pills because "[she] was trying to make [her] mom feel bad."

7

B.J. testified that before the March 23, 2009 incident, A.C.'s medication had been switched from Abilify to Lithium.[6]  Dr. Finn's report reflects that A.C.'s medication was changed after she "got into an argument with a parent on school grounds."  The March 23 incident occurred on the Monday after Spring Break in a classroom containing around twenty students.  Around a week before, on the Friday before Spring Break and not long after A.C.'s medication had been changed, A.C. called B.J. from school.  B.J. said A.C. was crying and told B.J. that she did not know why she was crying and that she had been in an altercation with D.H. in the lunchroom.  B.J. specified that A.C. told her that D.H. had been trying to get her to fight with her in the lunchroom at school.

A.C. testified that she deserved a chance at probation because she knew what she had done to D.H. was wrong.  She elaborated, stating

> But then again, I just do not know what happened at the time as I was stabbing her.  I do admit that I did pick up the scissors and I then [sic] that I was going to stab her if she touched me.  But that was only because, you know, I was always, you know, getting in trouble.  And I only had one more chance and they were going to put me back in the eighth grade.[7]  So I was trying to stay out of as much trouble as I could.

---

[6] Jennings testified that Lithium is a drug that "if you're not taking it exactly as prescribed does have some severe side effects," and that as A.C. had just had the dosage increased the week before the March 23 stabbing, it  would be possible that "the level of her blood screen had not equaled out."  According to Dr. Finn's report, Lithium is a mood stabilizer.

[7] On cross-examination, A.C. elaborated about her concern about being put back in the eighth grade, stating that she had been in trouble for

just not wanting to do my work.  You know, that was before I was on my

8

And, you know, she was like picking a fight with me. And I was like, [D.H.], if you touch me, I was going to stab her. And I didn't think she was going to really try to fight me because she kept on coming, after I even got the scissors she still came at me. But that was just to scare her, but it really didn't.

A.C. testified that she remembered feeling really scared that D.H. was going to beat her up, that she had grabbed the scissors to scare D.H., that she had not intended to hurt D.H., and that she wanted to kill herself when she learned how badly she had hurt D.H.—one of her stabs nicked D.H.'s heart. A.C. testified that before her current medication, she "would just go bizarre and just chuck things, hit people."

## 2. A.C.'s Post-March 23 Incidents and Mental Health

On March 26, 2009, three days after she stabbed D.H., A.C. was released from detention for her mother to take her to UBH because she tried to cut herself.[8] At some point that day, she acquired a bottle of pills, took an excessive amount—according to A.C.'s testimony, because she wanted to kill herself after she found out how badly D.H. had been injured—and had to be taken to the emergency room to see if her stomach needed to be pumped. The doctor increased her Lithium dose, and the trial court allowed her to return home on an electronic monitor.

---

medicine. I really didn't listen to no one. You know, I thought I could do whatever and, you know, get away with it. And I've been doing that for so long that I was getting away with it at school.

[8] The social history included in A.C.'s psychological evaluation reflects that she was to be transported to UBH to be assessed for psychotropic medication and suicide ideation concerns.

At the time of the disposition hearing, A.C. was seeing a psychiatrist once a month and was taking Zoloft and an increased dosage of Lithium. B.J. testified that since A.C. has been on her medication, she has not tried to assault B.J. or go against anything B.J. tells her to do and that the Lithium seems to be working. A.C. testified that she had not discussed her March 26, 2009 suicide attempt with her doctors because "[she] just got out of the jail thing or whatever. So [she] didn't really want a lot of people to know."

At the time of the disposition hearing, A.C. was taking Zoloft twice a day, and she testified that now, when she gets angry, she does not "go off like how [she] used to" and that the medicine has helped her gain control of her impulses. She stated that she always takes her medicine in the way that she is supposed to and that even if she did not want to take it, B.J. would make sure that she takes it. She apologized to D.H. at the disposition hearing, stating

> I know what I did was wrong and you can take it however because I'm pretty sure you won't forgive me because of the fact that, you know, you almost died. And if somebody would have stabbed me, you know, I probably would be real mad too. But, you know, I am sorry not only to you but your family and your friends because the fact that I almost took you away from your loved ones. And if that would have happened to like one of my families, I wouldn't know what I would do. And this is not—I'm not putting a show on in front of the Judge or anybody. I mean, I really do want you guys to forgive me because I know what I did was wrong and I'm so sorry.

Jennings testified that he had not seen A.C. exhibit any aggressive behavior towards anyone while he supervised her. B.J. testified that A.C. would be a good candidate

10

for probation "[b]ased [on] her newly being bipolar and us trying to find out what medications work with her, I think that would be the best thing for her so that I can get the proper care that she needs."

In A.C.'s psychological evaluation, Dr. Finn observed that some of A.C.'s test responses "suggest a relatively low probability of aggressive behavior and more acting out generally. [His] impression is that this behavior is driven more by biological based problems of emotional and behavioral control and extreme temper outbursts with little or no provocation." However, he also noted in part of the report that A.C. "did not express any concern over her victim but stated that she is worried about 'going to jail,'" and that "[A.C.] reported some guilt about stabbing her victim but her test responses also suggest concern about avoiding punishment."

### 3. Electronic Monitor and Other Services

Jennings testified that the only services A.C. had received were supervision by him and an electronic monitor as an alternative to being kept at the detention center. A.C. had one violation of the electronic monitor, but he stated that it "possibly could have been [his] fault" because A.C. had been at the detention center and he might not have given the family proper time to get back home. Jennings indicated that there were a lot of programs that could potentially benefit A.C. but that A.C. had had very limited interaction with his department and had not yet had the opportunity to participate in many of the programs. He specifically mentioned the Family Partnership Program (FPP), a specialized caseload for juveniles in which

11

most of the clients take mental health medications, as a possibility for A.C. He stated that he thought if A.C. were allowed to remain in the community, a specialized caseload would definitely be in her best interest.

A.C. testified that if the trial court would give her probation, she would take advantage of any program offered to her, including anger management and counseling.

### 4. A.C.'s Ability to Follow Instructions and Rules

Jennings testified, "I think for the most part [A.C.] obeys her mother's rules." He described as follows one incident while he was supervising her in which he had to talk with A.C. about going to school:

> The only other concern is the mother called me one time; I guess [A.C.] didn't want to go to school. And it was reported to me, basically, that she had did some work on her hair and I guess she ended up cutting some spots out of her hair and she didn't feel that she wanted to go to school that day. So her mother called me because she was concerned that [A.C.] would be in violation of her electronic monitor. I was able to calm—I was able to talk to [A.C.] over the phone and in person. I didn't have anything scheduled at that time, so I went out to the house. And she did end up going to school. But it was something where, basically, she would have been in violation of the Court's order of going to school every day and she was refusing initially. But she was able to turn around and did participate and go to school as she was instructed to.[9]

He stated that the other concern involved A.C.'s mother calling him about "something about [A.C.] getting a cell phone that she was not supposed to have and just having an argument with her sister about that," but he characterized it as

---

[9] A.C. described the incident as, "I had did some things to my hair and I was embarrassed and I didn't want to go to school."

"nothing more than what would normally transpire between teenagers or child and parent relation." Jennings testified that there were no problems with A.C. that were not easily solved and stated, "I think [A.C.] could complete probation if she was given an opportunity."

B.J. testified that A.C. follows the rules at home most of the time, but she qualified this, stating, "A lot of times that she don't, I'll just let her go and just do it anyhow. But most of the time, she does listen to me." She testified that there was no need to set a curfew because she did not let A.C. go anywhere except with relatives. A.C. testified that she would follow the rules of probation and the directions given by her parents, the probation department, and the court.

On March 26, 2009, before releasing A.C. from detention to go to UBH, the trial judge indicated that she did not want A.C. to have access either to the internet or to get on MySpace to communicate with anyone about the stabbing incident. Jennings testified, "She had explicit directions that she have no internet and no—actually, no My[S]pace." But a little over two weeks later, around 12:45 a.m., A.C. logged onto MySpace, contrary to the trial judge's specific orders. A.C. testified that she snuck her mother's internet-accessible phone out of her mother's purse while B.J. was asleep. She gave the following explanation on cross-examination:

> Q. . . . And you knew at that time, I'm assuming, that Judge Brown had specifically told you don't get back on My[S]pace?
>
> A. Yeah, I know that.

13

Q. Well, can you tell us why you did it?

A. I just felt like I just had to apologize. Like, I don't know why. I just had to. Even if that meant that I was violating my probation or whatever it's called, I just thought I had to apologize to her because, you know, people who don't even know me already think I'm a bad person.

Q. Well, if you think something's important, if there's something you have to do, do you feel like you need to do it even if it's against the Judge's orders?

A. No, not really. It depends. Like this right here, with the apologizing, I just thought that I really had to apologize to her.

On redirect, A.C. testified that she knew she had to follow court orders, that she would follow an order not to use the internet again except for educational purposes, and that she would delete her MySpace account, which she was already planning to do.

### 5. A.C.'s Support Network and Supervision

Jennings testified that he believed A.C.'s family was able to provide support and adequate supervision in the home. With regard to a support network and her family, B.J. testified that A.C. had "tons and tons of relatives" nearby, as well as A.C.'s stepfather, B.J., and her fourteen-year-old sister. A.C. described her family as "the only friends I've got," stated that they were always there for her, and stated that she felt like she had a strong support network to help her follow the rules, terms, and conditions of probation. Dr. Finn stated in his report that "[h]er parents appear supportive and are likely to comply with treatment and probation conditions."

### 6. Plans for A.C.

14

B.J. testified that A.C. had been sentenced to attend the Juvenile Justice Alternative Education Program (JJAEP) and that after she completed JJAEP, she was not going to let A.C. go back to public school.  She stated that she was looking for something a little more individually-oriented for A.C.  A.C. testified that she was going to try to go to a "chart school" because there were fewer students there and "it would be like less drama for [her]."

B.J. testified that the public would not be in danger if A.C. were allowed to remain in the community and that the current level of medication that A.C. was on had helped tremendously in controlling A.C.'s anger and impulses.  She stated that the psychotherapy that A.C. was receiving once a month was also helping so she intended to continue that.  And she stated that she thought A.C.'s bipolar diagnosis was something that could be controlled and that if she could not do it, "then, of course, [she'd] get the proper help that [A.C.] needs as far as mental hospitals, psychiatrist, therapist, or whatever it takes to get the best plan for her to get her stuff under control."

### 7.  Disposition Order Findings

In its disposition order, the trial court made the following findings:

> The Court finds [that] it is in the child's best interest to be placed outside the child's home.  The Court also finds that reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the child's home and the child, in the child's home, cannot be provided the quality of care and the level of support and supervision that the child needs to meet the conditions of probation.

15

It further appears to the Court that the best interest of the child and the best interest of society will be served by committing [A.C.] TO THE CARE, CUSTODY AND CONTROL OF THE TEXAS YOUTH COMMISSION for the following reason: the child needs a highly structured environment with constant supervision and control.

## C. Analysis

A.C. does not dispute that disposition was required, only the nature of the disposition ordered.

### 1. Best Interest

In her first issue, A.C. argues that the trial court's finding that it is in her best interest to be placed outside her home is directly contradicted by Jennings's testimony that the probation department could help A.C. and protect the community. She acknowledges

[i]f [her] bipolar condition were left untreated, if there was evidence effective medications had not yet been found, or if there was evidence A.C. did not take her medications, then removal from the home might be warranted to protect A.C. from herself and to protect her family and the community from A.C.

But, A.C. argues, the disposition hearing evidence showed the contrary—that effective medications had been found and that she was taking them. She also refers to Jennings's testimony that Lithium could have some severe side effects as tending to show that her medication might have initially contributed to her unstable conduct because she was diagnosed as bipolar in January and her medications were not properly adjusted until after the offense in March. And A.C. refers to her mother's testimony that she had not had any problems with A.C. since A.C. had been on her

16

medication and that she would continue to do whatever was required to keep A.C. out of trouble.

Notwithstanding the evidence above, however, in light of the disposition hearing evidence, the trial court could have questioned whether B.J. could effectively manage A.C., even with the support of the probation department and her extended family. *See, e.g., In re C.G.*, 162 S.W.3d 448, 452 (Tex. App.—Dallas 2005, no pet.) ("The trial judge heard the parents testify. She could well have concluded that the parents—despite their good intentions—underestimated appellant's problems. She could also have concluded that appellant's parents could not provide the highly structured and supervised setting C.G. required, according to both psychological assessment and probation officer.").

Given A.C.'s turbulent history and her own testimony about waiting until B.J. fell asleep to access her MySpace account in violation of the trial court's specific order, the determination of whether to grant probation rested primarily on whether the trial court believed that B.J. and A.C.'s support network would be able to effectively and consistently monitor A.C.'s behavior and reliably ensure that A.C. stayed on her medication. *See id.* A.C.'s own testimony about how, before she was on her medicine, she had been able to "get away with" whatever she wanted to do could have led the trial court to conclude that B.J. might eventually be less vigilant than necessary to protect the public. *See id.* And the violence of the crime A.C. committed against D.H. and her history of assaulting family members cannot be

17

minimized—the best interests of children who engage in serious and repeated delinquent conduct are superseded to the extent they conflict with public safety.[10] *See In re J.P.*, 136 S.W.3d 629, 632–33 (Tex. 2004) (referencing section 51.01 of the family code, which sets out the purpose of the juvenile justice code). Under the circumstances presented here, we cannot say that the trial court abused its discretion by concluding that it was in A.C.'s best interest to be placed outside her home or that the evidence supporting the finding is so weak or so contrary to the overwhelming weight of all the evidence that it should be set aside. *See Pool*, 715 S.W.2d at 635; *C.C.B.*, 2009 WL 2972912, at *3. We overrule A.C.'s first issue.

## 2. Reasonable Efforts

In her second issue, A.C. relies on Jennings's testimony that he thought that if she got into the Family Partnership Program, she could benefit from it to show that the evidence is factually insufficient to support the trial court's finding that reasonable efforts were made to prevent or eliminate the need for her removal from her home. She contends that she had not yet had the opportunity to participate in any type of counseling, that the trial court did not give her the opportunity to participate in the FPP, and that only if she had not been accepted into the FPP or if she had

---

[10] The trial judge observed immediately before making the challenged findings, "I think we're very fortunate that the victim in this case did not die, from what I've heard. And you are also very fortunate because you could be here for murder instead of aggravated assault with a deadly weapon." She indicated that she was also concerned about the other family violence issues and A.C.'s mental health.

unsuccessfully participated in the FPP could the trial court have found that reasonable efforts had been made to prevent the need for removal.

A.C. primarily bases her argument on Jennings's mere speculation that she could get into the FPP. That is, his specific testimony was

> Q. You mentioned the specialized caseload FPP. And that is specifically for juvenile respondents with mental health issues?
>
> A. Yes.
>
> Q. Do you feel [A.C.] would be an appropriate candidate for FPP?
>
> A. *I feel that that's something that they would have to determine if she met the qualification*. But based on my previous experience, I feel that *she could qualify potentially to be on their caseload*. [Emphasis added.]

Moreover, although A.C. complains that she had not yet had the opportunity to participate "in any type of counseling," at the time of the disposition hearing, A.C. was seeing a psychiatrist once a month. She admitted that she had not discussed her March 26, 2009 suicide attempt with her doctors. And while released on an electronic monitor into her mother's custody, A.C. violated the trial court's order not to access the internet. *Compare In re J.D.*, Nos. 04-01-00748-CV, 04-01-00749-CV, 2002 WL 31174477, at *2 (Tex. App.—San Antonio Oct. 2, 2002, no pet.) ("Reasonable efforts had been made to prevent the need for removal because J.D. had been allowed to remain in his home on electronic monitoring; however, those efforts were unsuccessful [because he committed an assault while on the electronic monitoring].")*, with In re A.D.*, 287 S.W.3d 356, 367–68 (Tex. App.—Texarkana

19

2009, pet. denied) (concluding that there was no evidence of reasonable efforts when A.D. had never previously been referred to authorities for any offense and he was placed in confinement shortly after committing intoxication manslaughter, where he remained until confined to TYC). The trial court could have concluded that, given the violent circumstances of this case, A.C. had received reasonable efforts to prevent her removal but that they were unsuccessful, and we cannot say on the facts of this case that this constituted an abuse of discretion. *See Pool*, 715 S.W.2d at 635; *C.C.B.*, 2009 WL 2972912, at *3. We overrule A.C.'s second issue.

### 3. Meeting Conditions of Probation

A.C. relies on her mother's testimony to show that she had the quality of care and the level of support and supervision needed to meet the conditions of probation and directs us to a portion of Dr. Finn's report in which he stated, "[A.C.'s] parents appear supportive and are likely to comply with treatment and probation conditions." She reiterates that Jennings testified that he thought her family provided a good support system and provided adequate supervision, that she herself testified that she thought she had a strong support network, and that her only violations mentioned at the disposition hearing—one of which Jennings attributed to himself—have not been repeated.

A.C. refers us to her mother's statement that A.C. followed her rules "most of the time." However, given that A.C. stabbed and almost killed another child, the trial court could have determined that "most of the time" was insufficient to ensure that

A.C. met the conditions of probation for the public's protection. Additionally, A.C. herself testified that whether she followed the trial court's orders would depend on if she felt something was important enough not to,[11] although she also testified that she would follow the trial court's orders and conditions of probation.

And while Jennings gave positive testimony about A.C. and her family, he also testified that before the March 23 stabbing, he had offered mediation to A.C. and B.J. after A.C. assaulted B.J., but B.J. declined it because she "did not feel that it was something that she could not handle," even though A.C. was able to leave home against B.J.'s wishes. While this occurred before A.C. was placed on medication, B.J.'s inability to effectively assess the situation and her child's precarious mental state between August 2008 and March 2009, despite repeated hospitalizations, may have contributed to the March 23 stabbing and the necessity of the disposition hearing. *See, e.g., C.G.*, 162 S.W.3d at 453 ("Appellant's parents did testify to their willingness to create more structure for appellant's days and to monitor his conduct more closely. We have no basis for doubting the parents' sincerity concerning their desire to help their son. Appellant himself testified that he had learned his lesson and that he could live at home and comply with the conditions of probation. However, the trial judge was in the best position to determine appellant's sincerity and

---

[11] With regard to violating the trial court's order not to access MySpace, A.C. testified that her motivation was that she felt like she had to apologize to D.H. on MySpace "because, you know, people who don't even know me already think I'm a bad person." Dr. Finn reported that A.C.'s test results suggested "an unusually strong tendency to look to other people as sources of emotional gratification."

credibility and to determine whether he was likely to successfully follow through with the conditions of probation if he lived at home.").

Under the circumstances presented here, we cannot say that the trial court abused its discretion by concluding that A.C. lacked the quality of care and level of support and supervision needed to meet the conditions of probation in her home or that the evidence supporting the finding is so weak or so contrary to the overwhelming weight of all the evidence that it should be set aside. *See Pool*, 715 S.W.2d at 635; *C.C.B.*, 2009 WL 2972912, at *3. We overrule A.C.'s third issue.

**4. Highly Structured Environment and Constant Supervision and Control**

In her fourth issue, A.C. admits that the trial court's finding that she needed a highly structured environment with constant supervision and control supported the reason for a disposition. However, she argues that the finding does not support why commitment to TYC was necessary if she could otherwise get the structure and supervision she needed without being removed. She contends that if any of the previous findings fail, this finding must fail as well, incorporating her earlier arguments by reference. For the same reasons that we have already set forth above in addressing her first three issues, we conclude that the trial court did not abuse its discretion by finding that commitment to TYC was necessary because the disposition hearing testimony could have led the trial court to reasonably conclude that A.C. lacked the structure and supervision she needed. Therefore, we overrule A.C.'s final issue.

22

## IV. Conclusion

Having overruled each of A.C.'s four issues, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, DAUPHINOT, and GARDNER, JJ.

DELIVERED: April 29, 2010