

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-18-00006-CV

IN THE MATTER OF H.C.

On Appeal from the County Court
Lamar County, Texas
Trial Court No. 23-CJV-17

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

O P I N I O N

On September 29, 2017, the County Court of Lamar County, acting as a juvenile court, determined that fifteen-year-old H.C. had engaged in delinquent conduct by committing theft of property valued at $2,500.00 or more, but less than $30,000.00, a state-jail felony,[1] and placed H.C. on twelve months' probation in the custody of her great-grandmother, I.B.[2] Approximately three weeks later, H.C. took her grandmother's vehicle without permission, and she and some friends drove it to Houston, thereby violating several conditions of her probation. Consequently, after a hearing on the State's motion to modify disposition, the juvenile court entered its order modifying its disposition by committing H.C. to the care, custody, and control of the Texas Juvenile Justice Department (TJJD) for an indeterminate period of time not to exceed her nineteenth birthday.

On appeal, H.C. contends (1) that the juvenile court erred in (a) failing to order a medical or psychiatric inquiry into her competency to proceed with the modification hearing and (b) failing to stay the proceedings in order to have her examined to determine whether she had an intellectual disability; (2) that she received ineffective assistance of counsel at trial; and (3) that there is legally insufficient evidence to support the trial court's findings (a) that she could not, in her home, be provided the care and level of support and supervision needed to meet the conditions of probation and (2) that reasonable efforts had been made to prevent or eliminate the need to remove her from the home. We find that (1) the juvenile court did not err by not staying the proceedings and

---

[1]*See* TEX. PENAL CODE ANN. § 31.03(e)(4)(A) (West Supp. 2017).

[2]We refer to the juvenile and her family members by their initials. *See* TEX. R. APP. 9.8(c)(1).

2

ordering a mental examination, (2) ineffective assistance of counsel has not been shown, and (3) legally sufficient evidence supports the challenged findings of the trial court. We will affirm the trial court's order.

## I. Background

On September 29, 2017, H.C. pled true to the State's allegations that she had committed delinquent conduct by committing a state-jail-felony-level theft. Before her plea, the juvenile court examined H.C., who testified that she understood the charges, the punishment range, and that she could be confined in the TJJD until she was nineteen years old. H.C. also affirmed that, if it was determined that the State's charges were true, she would have a record that could be used against her in the future in a criminal proceeding. In addition, she affirmed that she understood her constitutional rights to a jury, to confront witnesses, to remain silent, and to require the State to prove its charges beyond a reasonable doubt. Both H.C. and her guardian, I.B.,[3] informed the juvenile court that they had had sufficient time to consult with H.C.'s appointed counsel and that they were satisfied with his representation. H.C. also told the juvenile court that she had signed and understood the stipulation of evidence offered by the State, that it had been explained to her by her attorney, and that she was pleading guilty of her own free will.

The juvenile court then found that H.C. had engaged in delinquent conduct by committing the charged theft and placed H.C. on twelve months' probation in the care of I.B. In addition to the typical conditions of probation, the juvenile court ordered H.C. to successfully complete counseling, therapy, or treatment as arranged by her probation officer, to follow through with

---

[3]I.B. is H.C.'s great-grandmother, who has cared for H.C. since she was five or six weeks old.

Amanda Holmes at Red River Behavioral Health and take medication as prescribed,[4] and to participate in individual counseling with Melissa Ladd.

On October 21, 2017, H.C. and two friends took H.C.'s grandmother's vehicle without permission and drove it to Houston. On October 25, 2017, H.C. was placed in the Grayson County Juvenile Detention Center (the Detention Center), where she remained until the hearing to modify disposition. At the hearing, H.C. pled true to the State's allegations that she had violated three terms of her probation, including committing the offense of unauthorized use of a motor vehicle.

Testimony at trial showed that H.C. had been in counseling and on medication since she was ten years old, but that there had been no significant improvement in her behavior. Janean Butler, H.C.'s juvenile probation officer, testified that there had been a number of medications tried, which would bring some initial improvement, but H.C. would always return to being defiant, aggressive, and destructive both at home and in school. As she has gotten older, her behavior problems have only gotten worse.

In February 2017, H.C. began to wean off of her medication, until she was taking no medication by April 2017.[5] Also in February, H.C. and a friend ran away from home and stayed in a house in Greenville. When she was returned home, she reported that the owner of the house had sexually assaulted them. Then, in August, H.C. and four other juveniles stole an all-terrain vehicle in Paris, which resulted in H.C.'s original adjudication and probation. While on probation, although I.B. supervised H.C. in taking her medication, H.C. would spit it out afterwards. About

---

[4]Until the preceding April, H.C. had been seeing Holmes and had been taking medication prescribed for her diagnoses of bipolar disorder, attention deficit/hyperactive disorder (ADHD), and oppositional defiant disorder (ODD).

[5]It is unclear whether Holmes approved of H.C. weaning off of her medication.

three weeks into her probation, H.C. and two friends took her grandmother's vehicle, drove it to Houston, and abandoned it. The girls got picked up by a pedophile and the other girls left on a bus, but H.C. went to a shelter where she was found by the police.

Dr. Kevin Weatherly, a licensed psychologist, testified that he had met with H.C. in the Detention Center in late November and late December 2017, where he tested her cognitive/intellectual, personality, and emotional functioning. He also spoke with I.B. and a person at H.C.'s school and reviewed Holmes' notes. Weatherly confirmed H.C.'s bipolar disorder, ADHD, and ODD diagnoses. He also found that H.C.'s intellectual functioning was low, fairly close to where he would diagnose an intellectual disability. Weatherly testified that ADHD causes an inability to consistently control impulses to act because of a degradation in executive functioning and that ODD indicates a pattern of behavior that involves repeated violations of rules and arguing with those in authority. He noted that there had been an inconsistent taking of medication by H.C., which would cause repeated ups and downs cognitively and emotionally. He stressed that consistency was the key to her treatment and that medication was the primary factor for her successful treatment.

Weatherly opined that H.C. would benefit from consistent medication management services, including compliance with the regimen prescribed and individual and family counseling. He testified that all of these services were available locally. Based on his interviews with H.C. and I.B., Weatherly believed that H.C. would comply with his recommendations and that I.B. was capable of providing the medication management services and other support necessary.

5

Weatherly opined that it was in the best interest of H.C. to give her another chance at home provided she was compliant with the medication and treatment recommendations. However, he also testified that, without compliance and treatment, the risk would be very large for the community and to H.C. and that H.C. would repeat her prior behavior and offenses.

Danna Nixon, a juvenile supervision officer at the Detention Center, testified that H.C. has had seven incident reports for infractions of Detention Center rules, but that most of the infractions were minor. She testified that, for the couple of weeks preceding the hearing, H.C. had followed directions very well. Nixon also testified that the only medications given to H.C. while at the Detention Center had been over-the-counter medications.

H.C.'s juvenile probation officer, Janean Butler, testified that, while on probation and before being placed in the Detention Center, H.C. had attended one individual counseling session. Family counseling had not been scheduled because no times were available. Butler testified that, while H.C. had a loving family who wanted her to come back home, the things I.B. and the rest of the family had tried in an attempt to address H.C.'s issues were not successful. She pointed out that H.C.'s history of running away had placed her in situations in which she could have been killed or she could have killed someone else. She also testified that there were not adequate resources in Lamar County to address H.C.'s issues and that she believed it was in H.C.'s and the community's best interests that H.C. not be returned home.

Butler also testified that she had found no out-of-home alternative to TJJD for H.C. because of her history of running away and being aggressive toward her peers. Specifically, she testified that there were no boot camp programs for females available and that there were only short-term

6

treatment facilities available for juveniles, but that H.C. required more than a short-term facility. Butler believed that all of the services required by Weatherly's recommendations could be obtained both in Paris and at the TJJD. Although Butler agreed with Weatherly that some of H.C.'s issues arose in part from inconsistent medication and agreed with his recommendations for treatment for H.C., she disagreed that H.C. could be successful at home. She pointed out that Weatherly's recommendations were the same as the conditions of her probation, which H.C. and I.B. promised they would do, but failed to implement.

I.B., who is seventy-six years old, testified that the last time H.C. saw Holmes was in February 2017, when H.C. asked Holmes to let her go off of her medication. She claimed that Holmes told H.C. she could wean off of them. I.B. testified that H.C. does different chores around the house, that she screens with whom H.C. associates, and that she will continue to do so in the future. She also testified that she and H.C.'s grandmother, who lives nearby, have lock boxes for their car keys, and she assured the trial court that she would help with all of Weatherly's recommendations.

I.B. testified that she believed that being in detention woke H.C. up, that H.C. was remorseful for her actions, and that H.C. had made genuine changes to her behavior. Nevertheless, she admitted that H.C. sometimes ran away when she got angry and that, in spite of I.B.'s watchful eye, H.C. had had seven contacts with the police since 2013. She also agreed that, when H.C. took her grandmother's car to Houston, it was incredibly dangerous. I.B. also testified that, before being placed in the Detention Center, H.C. had been going to an alternative school.

7

H.C. also testified. She said that she thought Holmes over medicated her and that the medications took away her personality. She did not think she needed them in February 2017, but now she knows that she does. She told the trial court that she would be willing to go back on the medications, to work with Holmes, and to follow Weatherly's recommendations. She testified that going to the Detention Center was a wake-up call and that she now realizes the value of having a family. She also testified that, at the Detention Center, she learned to control her impulse, attitude, and behavior and that she plans to go back to school, graduate, and then join the military. H.C. said that she had been attending an alternative high school because of the felony she committed and getting into disagreements with other students, some of which became physical.

At the end of the hearing, the trial court entered its order modifying its disposition by committing H.C. to the care, custody, and control of the TJJD for an indeterminate period of time not to exceed her nineteenth birthday.

## II. The Trial Court Did Not Err by Not Ordering a Mental Examination Into H.C.'s Alleged Unfitness to Proceed

In her first and second issues, H.C. complains that the trial court erred when it failed to *sua sponte* order a medical or psychiatric inquiry into her unfitness to proceed with the modification hearing and when it failed to stay the proceedings in order to have her examined to determine whether she had an intellectual disability. H.C. concedes that, under the Texas Family Code, a juvenile court is only required to determine whether probable cause exists to believe a juvenile is unfit to proceed with a modification hearing when a motion is made by a party.[6] *See*

---

[6]A juvenile court is required to stay the proceedings and order a physical or mental examination of the child only if it "determines that probable cause exists to believe that the child is unfit to proceed." TEX. FAM. CODE ANN. § 55.31(c)

8

TEX. FAM. CODE ANN. § 55.31(b) (West Supp. 2017) (providing that, "[o]n a motion by a party, the juvenile court shall determine whether probable cause exists to believe that a child . . . is unfit to proceed as a result of mental illness or an intellectual disability"). She also concedes that, although the juvenile court may make this determination on its own motion, it is not statutorily required to do so. *In re J.K.N.*, 115 S.W.3d 166, 168–69 (Tex. App.—Fort Worth 2003, no pet.). No motion contemplated by Section 55.31(b) was made or filed in this case.

Nevertheless, H.C. contends that, because a juvenile proceeding is quasi-criminal, and because the evidence at the modification hearing showed that she suffered from a mental illness and possibly had an intellectual deficiency, due process required that the juvenile court order a mental examination and make a determination of her fitness to proceed on its own motion. The State argues that H.C. has not preserved this complaint for our review since she did not make a timely request, objection, or motion to the trial court asserting her complaint. *See* TEX. R. APP. P. 33.1(a). Therefore, we must first determine whether H.C. may assert her complaint for the first time on appeal.

## A. H.C. Was Not Required to Assert Her Complaints in the Juvenile Court

On appeal, juvenile proceedings are to be governed by the civil rules of appellate procedure as far as practicable. *In re D.I.B.*, 988 S.W.2d 753, 756 (Tex. 1999). As the State points out, the general rule is that, to preserve a complaint for appellate review, the complainant must make a timely request, objection or motion to the trial court specifically stating the grounds of her

---

(West Supp. 2017). Therefore, whether the juvenile court was required to order a medical or psychiatric examination necessarily depends upon, and includes, the question of whether the juvenile court was required, on its own motion, to determine whether probable cause exists to believe the child is unfit to proceed.

complaint and obtain a ruling, or a refusal to rule, on her request, objection or motion. TEX. R. APP. P. 33.1(a). However, a juvenile proceeding is only quasi-criminal, and as such, this general rule "cannot be applied across the board in juvenile proceedings. *In re C.O.S.*, 988 S.W.2d 760, 765 (Tex. 1999).

In *C.O.S.*, the Texas Supreme Court looked to the decisions of the Texas Court of Criminal Appeals for guidance on how Rule 33.1 should be applied in juvenile cases. *Id.* The Texas Supreme Court noted that the Texas Court of Criminal Appeals has held that Rule 33.1's predecessor, as a procedural rule, "does not affect the substantive rights of a criminal defendant." *Id.* (citing *Marin v. State*, 851 S.W.2d 275, 278 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997)). Recognizing that "it [is] unwise and problematic to apply one preservation rule in adult, criminal proceedings and another, stricter rule in juvenile cases," the Texas Supreme Court applied the preservation scheme set forth by the Texas Court of Criminal Appeals in *Marin* to juvenile cases. *Id.* at 767; *see also In re B.L.D.*, 113 S.W.3d 340, 350–51 (Tex. 2003).

In *Marin*, the Texas Court of Criminal Appeals recognized that errors may relate to three categories: (1) absolute or systemic requirements, (2) waivable-only rights, and (3) forfeitable rights. *Marin v. State*, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997). Forfeitable rights are those "rights that the trial court has no duty to enforce unless requested." *C.O.S.*, 988 S.W.2d at 765 (citing *Marin*, 851 S.W.2d at 279–80). The Texas rules of procedural default, such as Rule 33.1, only apply to forfeitable rights. *Marin*, 851 S.W.2d at 279. Absolute or systemic requirements are "law[s] that

10

a trial court has a duty to follow even if the parties wish otherwise." *Mendez v. State*, 138 S.W.3d 334, 340 (Tex. Crim. App. 2004). These requirements include personal and subject-matter jurisdiction and a penal statute's compliance with the separation of powers section of the Texas Constitution. *Aldrich v. State*, 104 S.W.3d 890, 895 (Tex. Crim. App. 2003) (citing *Saldano v. State*, 70 S.W.3d 873, 888 (Tex. Crim. App. 2002)).

Waivable-only rights are "rights of litigants which must be implemented by the system unless expressly waived." *Mendez*, 138 S.W.3d at 340 (quoting *Marin*, 851 S.W.2d at 279). Waivable-only rights cannot be forfeited by inaction alone, rather they must be expressly waived. *Marin*, 851 S.W.2d at 278–79. These rights include the right to assistance of counsel, the right to a jury trial, and statutory rights made waivable-only. *Aldrich*, 104 S.W.3d at 895 (citing *Saldano*, 70 S.W.3d at 888). Errors that assert a violation of an absolute or systemic requirement, or a denial of a waivable-only right, may be raised for the first time on appeal. *Id.* (citing *Saldano*, 70 S.W.3d at 888).

As we have previously recognized,

A fundamental principle of our criminal justice system is "that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."

*Tadlock v. State*, 484 S.W.3d 560, 567–68 (Tex. App.—Texarkana 2016, no pet.) (quoting *Drope v. Missouri*, 420 U.S. 162, 171 (1975)). The United States Supreme Court has characterized the right not to stand trial while incompetent as "fundamental," and that right is "sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency

11

determination." *Cooper v. Oklahoma*, 517 U.S. 348, 354 n.4 (1996) (citing *Pate v. Robinson*, 383 U.S. 375, 384 (1966)).

In *Cooper*, the Court emphasized,

Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Id.* at 354 (quoting *Riggins v. Nevada*, 504 U.S. 127, 139–40 (1992) (Kennedy, J., concurring)). Therefore, "the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (citing *Pate*, 383 U.S. at 385); *accord McDaniel v. State*, 98 S.W.3d 704, 709 (Tex. Crim. App. 2003).

In criminal cases, the Texas Court of Criminal Appeals has long held that, even where there is no request or demand by the defendant, where facts come before the trial court sufficient to create a reasonable basis to doubt the accused's competency, the trial judge must halt the proceedings and conduct a competency hearing. *Bonner v. State*, 520 S.W.2d 901, 905–06 (Tex. Crim. App. 1975) (citing *Wages v. State*, 501 S.W.2d 105 (Tex. Crim. App. 1973); *Price v. State*, 496 S.W.2d 103 (Tex. Crim. App. 1973)). The Court has noted that the procedure set forth in the Texas Code of Criminal Procedure was enacted by the Texas Legislature, consistent with United States Supreme Court opinions and Texas Court of Criminal Appeals jurisprudence, "[t]o adequately guard the right to a fair trial where evidence of the defendant's incompetence is raised during trial." *McDaniel*, 98 S.W.3d at 709 n.13 (quoting *Alcott v. State*, 51 S.W.3d 596, 599 (Tex. Crim. App. 2001)).

12

The Code of Criminal Procedure states, "If evidence suggesting the defendant may be incompetent to stand trial comes to the attention of the court, the court on its own motion shall suggest that the defendant may be incompetent to stand trial." TEX. CODE CRIM. PROC. ANN. art. 46B.004(b) (West 2018).[7] Once it does so, the trial court "shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." TEX. CODE CRIM. PROC. ANN. art. 46B.004(c) (West 2018). If, after informal inquiry, "the court determines that evidence exists to support a finding of incompetency," it must then order an examination by experts "to determine whether the defendant is incompetent to stand trial." TEX. CODE CRIM. PROC. ANN. art. 46B.005(a) (West 2018). The trial court must then hold a trial to determine the defendant's incompetency to stand trial, unless neither party requests the trial, or both parties and the trial court agree the defendant is incompetent. TEX. CODE CRIM. PROC. ANN. art. 46B.005(b), (c) (West 2018).

Thus, both the Court of Criminal Appeals and the Legislature have recognized that, in a criminal proceeding, the procedural safeguards necessary to guard the defendant's right not to be tried when she is incompetent to stand trial must include a requirement that the trial court, on its own motion, make an inquiry into the defendant's competency to stand trial when sufficient evidence comes to its attention. Because the failure to observe adequate procedures to protect this right deprives the defendant of her due process right to a fair trial, we find that a complaint asserting the failure of a trial court on its own motion to make inquiry into the defendant's

---

[7]Either party may also suggest by motion that the defendant is incompetent to stand trial. TEX. CODE CRIM. PROC. ANN. art. 46B.004(a) (West 2018).

13

competency to stand trial is included among the waivable-only rights that may be asserted for the first time on appeal. *See Pate v. Robinson*, 383 U.S. 375, 384 (1966). Therefore, we find that H.C. did not have to preserve her complaint in the juvenile court.

## B. No Trial Court Error

Although H.C. may assert her complaint for the first time on appeal, this does not end the inquiry into whether the constitutional protections afforded to criminal defendants under the Code of Criminal Procedure should be afforded to a juvenile defendant. As noted earlier, the Family Code, unlike the Code of Criminal Procedure, does not require the juvenile court to sua sponte order an evaluation to determine whether a child is fit to proceed with a modification hearing when it has evidence before it suggesting that the child may be unfit to proceed.[8] *See* TEX. FAM. CODE ANN. § 55.31(b). To determine whether the particular constitutional protections afforded to a criminal defendant under Section 46B.004 of the Code of Criminal Procedure must be afforded to a juvenile defendant, we must "balance[] the function that [the asserted] constitutional or procedural right serve[s] against its impact or degree of impairment on the unique processes of the juvenile court." *Lanes v. State*, 767 S.W.2d 789, 794 (Tex. Crim. App. 1989); *accord Hidalgo v. State*, 983 S.W.2d 746, 751–52 (Tex. Crim. App. 1999). This balancing "requires an exploration of the specific purposes of both the juvenile system and the constitutional right being asserted." *Lane*, 767 S.W.2d at 794.

---

[8]We note that, until 1995, Section 55.31's predecessor statute required the juvenile court, on its own motion, to order an appropriate medical inquiry and to conduct a separate hearing to determine the child's fitness to proceed, "[i]f it appear[ed] to the juvenile court" that the child "may be unfit to proceed." Act of May 25, 1973, 63d Leg., R.S., ch. 544, 1973 Tex. Gen. Laws 1460, 1482 (amended 1995, 1999) (current version at TEX. FAM. CODE § 55.31); *In re J.D.*, 773 S.W.2d 604, 605 (Tex. App.—Texarkana 1989, writ dism'd w.o.j.).

14

In this case, we need not decide whether a juvenile court is required, on its own motion, to determine whether probable cause exists to believe a child is unfit to proceed with a modification hearing when it has evidence before it suggesting that the child may be unfit to proceed. Under the facts of this case, even if the juvenile court was required to make a probable cause determination on its own motion, it did not abuse its discretion[9] in not doing so. The Family Code provides that a child is unfit to proceed with a modification hearing when the child "as a result of mental illness or an intellectual disability lacks capacity to understand the proceeding in juvenile court or to assist in the child's own defense." TEX. FAM. CODE ANN. § 55.31(a). Assuming, but not deciding, that the juvenile court was required to make the determination on its own motion, we examine the record to see whether sufficient evidence was before the court showing that H.C., as a result of mental illness or intellectual disability, lacked capacity to understand the proceeding or to assist in her own defense, so that the juvenile court was required to make a probable cause determination. *See K.A.H.*, 700 S.W.2d at 784.

For purposes of the juvenile justice code, a "mental illness" is defined as "an illness, disease, or condition, other than epilepsy, dementia, substance abuse, or intellectual disability" that "substantially impairs a person's thought, perception of reality, emotional process, or judgment" or "grossly impairs behavior as demonstrated by recent disturbed behavior." TEX. HEALTH & SAFETY CODE ANN. § 571.003(14) (West 2017); *see also* TEX. FAM. CODE ANN. § 55.01 (West Supp. 2017). An "intellectual disability" means "significantly subaverage general

---

[9]We review a juvenile court's decision regarding whether probable cause exists to believe the child is unfit to proceed for an abuse of discretion. *See In re K.A.H.*, 700 S.W.2d 782, 784 (Tex. App.—Fort Worth 1985, no writ).

15

intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEALTH & SAFETY CODE ANN. § 591.003(7-a) (West 2017).

An examination of the record shows that H.C. was diagnosed with bipolar disorder, ADHD, and ODD,[10] all of which contributed to her emotional and behavioral problems and, at times, affected her ability to make proper judgments. Weatherly also testified that H.C.'s intellectual functions were low and close to what he would classify as an intellectual disability. However, testimony also showed that, while H.C. was at the Detention Center, her ability to control her behavior and emotions and her judgment improved, even without medication or treatment of her disorders. Further, neither Weatherly, nor any other witness, testified that H.C.'s disorders or her low intellectual functioning impaired her ability to understand the juvenile proceedings or to assist in her own defense.

To the contrary, the record shows as a whole that H.C. understood the nature of the proceedings, was able to consult with her counsel, and was able to assist in her own defense. At the original adjudication hearing, the juvenile court thoroughly examined and admonished H.C. regarding her entry of a plea of true and her stipulation to the evidence. Her responses showed that she understood the charges against her, the consequences of pleading true, the range of punishment, the terms of her probation, and the possible consequences if she was not successful in her probation.[11]

---

[10]*See supra* note 4.

[11]When the juvenile court asked her what could happen if she violated a term or condition of her probation, H.C. responded, "I could go to TYC 'til I'm nineteen."

At the modification hearing, the juvenile court again examined H.C. before accepting her plea of true to the State's allegations to ensure that she had reviewed the stipulation of evidence with her attorney and understood it before she signed it. Later, in her case-in-chief, H.C. testified on her own behalf and answered questions from her own counsel, the State, and the juvenile court. She was able to give appropriate and intelligent answers to the questions that demonstrated that she knew the nature of the proceeding and that she was able to assist in her defense.

A juvenile court is only required to stay the proceedings and order a physical or mental examination of the child if it makes the determination that probable cause exists to believe that the child is unfit to proceed. TEX. FAM. CODE ANN. § 55.31(c). On this record, we find that there was no evidence before the juvenile court to indicate that H.C. lacked the capacity to understand the proceedings or to assist in her own defense as a result of any mental illness or intellectual disability. Therefore, assuming a juvenile court is required to make a probable cause determination if sufficient evidence is before it to indicate the child is unfit to proceed, the record establishes that H.C. understood the nature of the proceedings and was able to assist with her defense and consult with her attorney. Accordingly, the record does not establish probable cause to believe that H.C. was unfit to proceed, and, therefore, the juvenile court did not abuse its discretion in not making that determination.

Consequently, we find that the juvenile court did not err in failing to stay the proceedings and order a mental examination of the child. We overrule H.C.'s first and second issues.

## III.     Ineffective Assistance of Counsel Has Not Been Shown

In her third issue, H.C. complains that she received ineffective assistance of counsel because her trial counsel failed to request a complete mental health evaluation to determine if she was mentally ill.  Although not entirely clear from her brief, it appears that H.C. complains of her trial counsel's failure to file a motion under both Section 55.51 asserting her lack of responsibility for her conduct and Section 55.31 asserting her unfitness to proceed.  *See* TEX. FAM. CODE ANN. §§ 55.31, 55.51 (West Supp. 2017).

In a juvenile proceeding, the juvenile has a constitutional right to effective assistance of counsel.  *In re A.D.*, 287 S.W.3d 356, 362 (Tex. App.—Texarkana 2009, pet. denied); *In re S.C.*, 229 S.W.3d 837, 842 (Tex. App.—Texarkana 2007, pet. denied).  We review the effectiveness of counsel's representation under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).  *A.D.*, 287 S.W.3d at 362.  Under that standard, H.C. must both show that her "counsel's performance was deficient and that the deficient performance prejudiced the defense."  *A.D.*, 287 S.W.3d at 362 (citing *Strickland*, 466 U.S. at 687).

A failure to make a showing under either prong defeats a claim for ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003).  Allegations of ineffectiveness "must 'be firmly founded in the record.'"  *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) (quoting *Thompson v. State*, 9 S.W.3d 808, 813–14 (Tex. Crim. App. 1999)).  The *Strickland* test "of necessity requires a case-by-case examination of the evidence."  *Williams v. Taylor*, 529 U.S. 362, 382 (2000) (quoting *Wright v. West*, 505 U.S. 277, 308–09 (1992) (Kennedy, J., concurring in judgment)).

18

When a claim of ineffective assistance of counsel is raised for the first time on direct appeal, the record "is in almost all cases inadequate to show that counsel's conduct fell below an objectively reasonable standard of performance." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). Nevertheless, "when no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as she did." *Id*. Moreover, where the reviewing court "can conceive potential reasonable trial strategies that counsel could have been pursuing," the court "simply cannot conclude that counsel has performed deficiently." *Id*. at 103. Essentially, when a party raises an ineffective assistance of counsel claim for the first time on direct appeal, the defendant must show that, "under prevailing professional norms," *Strickland*, 466 U.S. at 690, no competent attorney would do what trial counsel did or no competent attorney would fail to do what trial counsel failed to do. *Andrews*, 159 S.W.3d at 101.

To the extent H.C. complains of trial counsel's failure to file a motion for a determination whether she was unfit to proceed under Section 55.31, our discussion above shows that there is nothing in the record to indicate that H.C. lacked the capacity to understand the proceedings or to assist in her own defense as a result of any mental illness or intellectual capacity. Therefore, the record does not show that trial counsel's performance was deficient in failing to file a motion under Section 55.31.

Section 55.51 of the Family Code provides that a child is not responsible for the conduct alleged "if at the time of the conduct, as a result of mental illness or an intellectual disability, the

19

child lacks substantial capacity either to appreciate the wrongfulness of the child's conduct or to conform the child's conduct to the requirements of law." TEX. FAM. CODE ANN. § 55.51(a) (West Supp. 2017). On a motion by a party alleging that the child may not be responsible as a result of mental illness or intellectual disability, the juvenile court is required to order the child to be examined under Section 51.20 and obtain an expert report about whether the child is not responsible. TEX. FAM. CODE ANN. § 55.51(b) (West Supp. 2017). Under Section 51.20, the juvenile court may order an examination of the child to determine whether the child has a mental illness or an intellectual disability. TEX. FAM. CODE ANN. § 51.20(a) (West 2014); *see* TEX. HEALTH & SAFETY CODE ANN. § 591.003(13) (West 2017).[12]

As we have previously noted, the record shows that H.C. has been diagnosed with bipolar disorder, ADHD, and ODD, all of which contributed to her emotional and behavioral problems and, at times, affected her ability to make proper judgments. Weatherly also testified that H.C.'s intellectual functions were low and close to what he would classify as an intellectual disability. However, the record also shows that H.C.'s ability to control her emotions and to make proper judgments was not always impaired by her disorders or low intellectual function.

No evidence in the record indicates that, at the time H.C. committed the alleged conduct, she lacked the substantial capacity either to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law. In *S.C.*, the evidence showed that the juvenile suffered from some of the same disorders as H.C. *See S.C.*, 229 S.W.3d at 843. There, as here, there was no evidence showing that, at the time she committed the conduct, the disorders caused

---

[12]We have previously stated the definitions of mental illness and intellectual disability under the juvenile justice code.

20

her to have a lack of capacity, and we found that there was no ineffective assistance of counsel. *Id.*

H.C. also points to her trial counsel's attorney fee voucher and supporting records and contends that counsel was deficient in failing to consult with a psychologist to investigate H.C.'s mental state. The supporting records show that trial counsel charged for a one-hour meeting with H.C.'s great-grandmother, for two hours to review the file and psychologist and counseling reports and to prepare for the modification hearing, and for four hours for final preparation and the hearing. From this sparse record, H.C. asks us to assume that trial counsel never spoke to Weatherly or any other psychologist regarding their opinions of whether H.C. lacked substantial capacity at the time of the alleged conduct as a result of mental illness or intellectual capacity. However, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Without an explanation from trial counsel regarding the nature and extent of his trial preparation, we cannot presume that he failed to consult with Weatherly or another psychologist to gather enough information to satisfy himself that requesting a court-ordered mental examination of H.C. would not yield a viable defense under Section 55.51.

On this record, we find that H.C. has not shown that her trial counsel's performance was deficient. Therefore, ineffective assistance of counsel has not been shown. *Rylander*, 101 S.W.3d at 110–11. We overrule H.C.'s third point of error.

## IV. Legally Sufficient Evidence Supports the Challenged Findings

In her fourth and fifth issues, H.C. contends that there is legally insufficient evidence supporting the juvenile court's findings that (1) H.C., in her home, cannot be provided the care

21

and level of support and supervision necessary to meet the conditions of probation and (2) that reasonable efforts had been made to prevent or eliminate the need to remove H.C. from the home.[13]

## A.    Standard of Review

Modifying a disposition in a juvenile case lies within the sound discretion of the juvenile court and will only be reversed for abuse of discretion. *In re J.M.*, 287 S.W.3d 481, 486 (Tex. App.—Texarkana 2009, no pet.); *In re J.R.C.*, 236 S.W.3d 870, 875 (Tex. App.—Texarkana 2007, no pet.).  A juvenile court abuses its discretion when it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *J.M.*, 287 S.W.3d at 486; *J.R.C.*, 236 S.W.3d at 875. Whether there is legally sufficient evidence supporting the juvenile court's findings is a relevant factor in determining whether the juvenile court abused its discretion. *In re A.D.*, 287 S.W.3d 356, 366 (Tex. App.—Texarkana 2009, pet. denied); *In re A.E.E.*, 89 S.W.3d 250, 256 (Tex. App.— Texarkana 2002, no pet.).

As with orders of disposition, we use the civil standard of legal sufficiency in considering whether the juvenile court abused its discretion in its order modifying disposition.[14]  *A.D.*, 287

---

[13]In a modification of disposition proceeding, if the child is placed outside the home, or is committed to the TJJD or a secure correctional facility, the juvenile court's order must include a determination that:
> (A)     it is in the child's best interests to be placed outside the child's home;
> (B)     reasonable efforts were made to prevent or eliminate the need for the child's removal from the child's home and to make it possible for the child to return home; and
> (C)     the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation.
TEX. FAM. CODE ANN. § 54.05(m) (West Supp. 2017).

[14]The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).  In making this determination, we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*  So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* at 822.  The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819.  Although we consider the evidence in

S.W.3d at 366; *In re T.E.G.*, 222 S.W.3d 677 (Tex. App.—Eastland 2007, no pet.). If some evidence supports the juvenile court's decision, there is no abuse of discretion. *J.M.*, 287 S.W.3d at 486; *J.R.C.*, 236 S.W.3d at 875. Further, there is no abuse of discretion where the juvenile court bases its decision on conflicting evidence. *A.D.*, 287 S.W.3d at 366; *In re B.N.F.*, 120 S.W.3d 873, 877 (Tex. App.—Fort Worth 2003, no pet.).

## B. Inability to Provide the Necessary Care, Support, and Supervision in the Home

H.C. argues that the evidence shows that the level of care, support, and supervision necessary for her to meet the conditions of probation can be provided in her home. She points primarily to the testimony of Weatherly, who opined, based on two meetings with H.C. and a conversation with I.B., that H.C.'s chances of compliance with his recommendations for treatment and medication were greater than in the past because her insights into her behavior had improved. It was undisputed that the medications for H.C.'s disorders and the individual and family counseling recommended by Weatherly were all available in the community. It was also undisputed that I.B. desired for H.C. to return home and that there were other family members living nearby who would help support H.C. H.C. testified that she wanted to return home, that she realized that she needs her medication, and that she promised to stay out of trouble.

However, the evidence also showed that, although H.C. had been on medications for her disorders and in counseling since she was ten years old, her behavior both in the home and at school had become progressively worse and more dangerous, all while living in the same home

a light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

23

and having the support of her extended family. Testimony showed that, in 2017 alone, H.C. had run away at least two times, committed two thefts, and had been in physical altercations at school. In addition, the evidence showed that, although H.C. was aware of the possible consequences of violating the conditions of her probation, she continued to refuse to take her medication and ultimately took her grandmother's vehicle without permission and drove it to Houston, placing her friends and herself in a dangerous situation.

Although Weatherly recommended that H.C. be given another chance to stay in her home, he also emphasized that consistently taking her medication was the lynchpin in her compliance with the conditions of her probation. If she failed to do that, he opined, the risk was very high that she would repeat her past behavior and place herself and others in danger. Further, although H.C.'s probation officer agreed with Weatherly's treatment recommendations, she disagreed that H.C. could be successful at home. She pointed out that his recommendations were the same as H.C.'s conditions of probation, which had not been successful.

Viewing the evidence in the light most favorable to the findings, we cannot say that the juvenile court's finding falls outside the zone of reasonable disagreement. Therefore, we find that there is legally sufficient evidence to support the juvenile court's finding that H.C. cannot be provided that level of care, support, and supervision in her home that is necessary to meet the conditions of probation. We overrule H.C.'s fourth issue.

### C. Reasonable Efforts to Prevent H.C.'s Removal from Her Home

H.C. contends that there was no testimony that the probation department had attempted to find a less restrictive placement for her than TJJD. We recognize that commitment to the TJJD

24

"is the most severe form of incarceration in the juvenile justice system." *J.R.C.*, 236 S.W.3d at 873 (citing *In re J.P.*, 136 S.W.3d 629, 634 (Tex. 2004) (Schneider, J., concurring)). However, when, as here, a juvenile was originally adjudicated for committing a felony and subsequently violated one or more conditions of probation, commitment to the TJJD by modification order is proper. TEX. FAM. CODE ANN. § 54.05(f) (West Supp. 2017); *In re J.P.*, 136 S.W.3d 629, 631–32 (Tex. 2004). "In such circumstances, the statute allows a trial court to decline third and fourth chances to a juvenile who has abused a second one." *J.P.*, 136 S.W.3d at 632. Further, the Texas Supreme Court has noted that "the act of modification itself indicates an in-home alternative has been tried, and undoubtedly most trial courts would find these efforts reasonable *because they ordered them.*" *Id.* at 632. Thus, there is no requirement that the juvenile court "exhaust all possible alternatives before sending a juvenile to the [TJJD]." *J.R.C.*, 236 S.W.3d at 875 (citing *In re M.A.*, 198 S.W.3d 388, 391 (Tex. App.—Texarkana 2006, no pet.)).

As we discussed above, the evidence showed that the level of care, support, and supervision in the home had been inadequate to address the needs of H.C., or to enable her to meet the conditions of her probation, both before and after she was placed on probation. Although H.C. was on probation for only three weeks before being placed in detention, in that time, she demonstrated her ability and inclination to undermine I.B.'s supervision and the conditions of probation by appearing to take her medication, then spitting it out when I.B. left her room. The juvenile court could have reasonably concluded that, even with more restrictive conditions of probation, H.C. was likely to continue to undermine I.B.'s supervision. In addition, H.C.'s

25

probation officer testified that there were no facilities or programs for juvenile females available in Lamar County that would adequately address H.C.'s needs.

Viewing the evidence in the light most favorable to the findings, we cannot say that the juvenile court's finding falls outside the zone of reasonable disagreement. Therefore, we find that there is legally sufficient evidence to support the juvenile court's finding that reasonable efforts were made to prevent or eliminate the need for H.C.'s removal from her home. Further, since some evidence supports the juvenile court's decision to commit H.C. to the TJJD, we find that the juvenile court did not abuse its discretion in committing her to the TJJD.[15] *See J.M.*, 287 S.W.3d at 486; *J.R.C.*, 236 S.W.3d at 875. We overrule H.C.'s fifth point of error.

For the reasons stated above, we affirm the judgment of the trial court.

Ralph K. Burgess
Justice

Date Submitted:      July 16, 2018
Date Decided:       October 3, 2018

---

[15]In her brief, H.C. cites several cases in which the courts of appeals reversed the juvenile court order committing the juvenile to the Texas Youth Commission (TYC), the predecessor to TJJD, in support of her argument that reasonable efforts have not been made to prevent H.C.'s removal from her home. *See In re S.G.*, No. 04-04-00475-CV, 2005 WL 763277 (Tex. App.—San Antonio Apr. 6, 2005, no pet.) (mem. op.); *In re K.L.C.*, 972 S.W.2d 203 (Tex. App.—Beaumont 1998, no pet.); *In re A.S.*, 954 S.W.2d 855 (Tex. App.—El Paso 1997, no pet.). However, both *K.L.C.* and *A.S.* were appeals from original orders of disposition where no efforts had been made to rehabilitate the juvenile in their home. *K.L.C.*, 972 S.W.2d at 204, 206; *A.S.*, 954 S.W.2d at 857, 862–63. Although *S.G.* was an appeal from a modification of disposition, the trial court based the commitment to TYC for the stated reason that it was time for the State, rather than the county, to begin paying for S.G.'s upkeep. The San Antonio court found that this did not conform to the stated goals of the juvenile justice code, so the juvenile court had no proper reason to commit S.G. to the TYC. *S.G.*, 2005 WL 763277, at *4.